[No. S043628. July 27, 2009.]

THE PEOPLE, Plaintiff and Respondent, v.
CELESTE SIMONE CARRINGTON, Defendant and Appellant.

148

## COUNSEL

Lynne S. Coffin and Michael J. Hersek, State Public Defenders, under appointment by the Supreme Court, Barry P. Helft, Chief Deputy State Public Defender, and Kathryn E. Collier, Deputy State Public Defender, for Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Robert R. Anderson, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Bruce Ortega and Amy Haddix, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**GEORGE, C. J.**—After a jury trial, defendant Celeste Simone Carrington was convicted of the first degree murders of Victor Esparza and Caroline Gleason, and the jury found true, as to each count of murder, allegations of burglary and robbery special circumstances. (Pen. Code, §§ 187, subd. (a), 190.2, former subd. (a)(17)(i), (vii), 1203.06, subd. (a)(1) & 12022.5, subd. (a).)[1] The jury also found true a multiple-murder special circumstance. (§ 190.2, subd. (a)(3).) Defendant was convicted of the second degree attempted murder of Dr. Allan Marks, and an allegation that she personally inflicted great bodily injury during the commission of that crime was found true. (§§ 664, 187, subd. (a), 12022.7.) She was convicted of the robbery of each of these three victims, as well as eight counts of commercial burglary. (§§ 211, 460, subd. (b).) Except as to five of the counts of commercial burglary, allegations that defendant personally used a firearm in the commission of these offenses were found true. (§§ 1203.06, subd. (a)(1), 12022.5, subd. (a).) After the penalty phase of the trial, the jury returned a verdict of death, and the trial court denied defendant's motion to modify the verdict to life imprisonment without the possibility of parole. (§ 190.4, subd. (e).) This appeal is automatic. (§ 1239, subd. (b).)

[1] All further statutory references are to the Penal Code unless otherwise indicated.

For the reasons discussed below, we reverse defendant's convictions for burglary in counts 9 and 10 and affirm defendant's remaining convictions and death sentence.

## I. Facts

### A. *Guilt Phase*

The offenses of which defendant Celeste Carrington was convicted arose out of four separate incidents. Most of the facts underlying these offenses were admitted by defendant in her statements to the police, which she made shortly after her arrest. The first incident involved the burglary of a Dodge dealership located at 640 Veterans Boulevard in Redwood City, on the night of January 17, 1992. In her statement to the police, defendant admitted the following. She previously had been employed as a janitor for several companies and, having worked in this building, defendant was aware that the back entrance was often left unlocked. She went to that location with gloves and a crowbar, which she used to force open several interior doors. Among other items, she stole a .357 magnum revolver and five bullets.

The second incident involved the burglary of a building located at 1123 Industrial Road in San Carlos and the murder of Victor Esparza, on the night of January 26, 1992. In her statement, defendant admitted the following. She previously had worked on the premises as a janitor and had retained a key to the building. She borrowed a car from her neighbor and drove to the location, armed with the .357 magnum revolver she had stolen from the Dodge dealership. She used her key to enter the building, accidentally setting off the alarm. Victor Esparza, who was cleaning the facility, observed her in an office cubicle. She told him that she worked in the building and must have accidentally set off the alarm. Esparza asked her to call the building manager to report the alarm, took out his wallet, and handed her a telephone number. Defendant displayed the gun and took his wallet, which contained about $45 or $55 in cash. She also demanded the personal identification number (PIN) for his automated teller machine (ATM) card, which he wrote down. As defendant walked out of the cubicle, she turned around and shot Esparza. She later attempted to use his ATM card, but the PIN he had given her was invalid. Defendant admitted that she intended to kill Esparza, and that the experience was exciting and made her feel powerful.

The forensic pathologist who performed the autopsy on Esparza, Peter Benson, testified that Esparza died of a gunshot wound to the head, inflicted from a distance of approximately six inches. Benson concluded that the angle of the gunshot wound was not inconsistent with the victim having been shot while kneeling and looking up at the shooter, nor was it inconsistent with the

possibility that the victim was standing. Celia Hartnett, a criminalist for the San Mateo County Sheriff's Laboratory who examined Esparza's body at the crime scene, testified that in her opinion—based upon the position of the body and the clothing, the pools of blood on the carpet, the blood on the clothing, and an abrasion on the forehead—he probably was on his knees when he was shot, with his arms raised in a defensive position; he likely fell forward and then rotated onto his back. Hartnett believed that Esparza was shot from a distance of between six inches and one foot.

The third incident involved the burglary of an office building located at 777 California Avenue in Palo Alto in Santa Clara County and the murder of Carolyn Gleason, on March 11, 1992. In her statement to the police, defendant admitted the following. She previously had worked as a janitor in the building and had retained a key. A neighbor gave her a ride to the premises from her apartment in East Palo Alto. Defendant brought a pair of gloves, a screwdriver, and the same .357 magnum revolver she had used to kill Victor Esparza. Her key would not open the door. She observed two cars in the parking lot and two janitors working in the building. She waited for these individuals to leave before using the screwdriver to open the door. Defendant walked through the facility looking for money but found none. She heard Caroline Gleason enter and go into an office. Defendant watched her and eventually encountered her in the copy room. When defendant displayed the gun, Gleason begged her to put it away. According to defendant, she did not want to hurt Gleason, but she became nervous and pulled the trigger.

After shooting Gleason, defendant took Gleason's keys and about $400 from her desk. She went outside to the parking lot and entered Gleason's car, where she found Gleason's purse, which contained her ATM card and PIN. Defendant drove the car to a bank in Palo Alto, where she made two unsuccessful attempts to withdraw money from Gleason's account; she was able to withdraw $200 from an ATM at a 7-Eleven store and another $100 from a second bank. She left the car in a hospital parking lot and took a taxi back to her apartment.

An autopsy indicated that Gleason died as the result of a single gunshot to the head fired from a very close range. The prosecution's forensic expert, criminalist Hartnett, opined—based upon the position of Gleason's body, the height of the blood spatters, the angle of the gunshot wound, and the presence of gunshot residue on Gleason's sleeve—that the victim was kneeling and had tried to cover her face when shot.

The fourth incident involved the burglary of a medical office building located at 801 Brewster Avenue in Redwood City and the attempted murder of Dr. Allan Marks, on the evening of March 16, 1992. Defendant, in her

statement to the police, admitted the following. As in two of the earlier incidents, she brought with her a key she had retained from her prior employment at the building as a janitor, a pair of gloves, and the same .357 magnum revolver. The doors to the building still were unlocked when she arrived at 5:30 p.m. After discovering that she was unable to open any of the internal offices with her key, defendant hid in a closet for a few hours. She emerged from the closet and spent some time in the building before observing Dr. Marks leaving his office after a late appointment. She decided to rob him and pulled out the gun. When Marks observed her, he "went crazy" and the two struggled over the gun. During the struggle she pulled the trigger three times, resulting in one misfire and two shots. Marks managed to force her out of the office and locked the door. Defendant fled the building, taking with her some access cards and prescription drugs.

Dr. Marks testified to a somewhat different version of the shooting. According to his account, as he was about to leave his office defendant pushed the door open and came "barreling through," causing the door to push him to the side. He recognized her as a former janitor in the building and began screaming and waiving his hands. Defendant was standing about three feet from him, holding a gun in her right hand. She pointed it at his upper body, and he heard gunshots. He was shot in the left shoulder, left thumb, and right forearm. After being shot, Marks collapsed to his knees and defendant left the office. He closed the door behind her and called 911.

Defendant was arrested a few days later. Her apartment in East Palo Alto was searched pursuant to three warrants obtained by the Los Altos, Palo Alto, and Redwood City Police Departments. The police found evidence that connected defendant to all four incidents: the keys to the Redwood City Dodge dealership; the gun that had been taken from the dealership, which was the weapon used to shoot Esparza, Gleason, and Marks; Gleason's pager and purse, and the key to the building in which she was shot; a box from Gleason's office that held petty cash; a piece of paper with Gleason's PIN on it; and a drug kit taken from a doctor's office in the medical building in which Marks was shot. After the search was completed, police officers from each of the three police departments interviewed defendant, and she confessed to being the perpetrator in each of the four incidents.

The defense presented no evidence at the guilt phase of the trial. In closing argument, defense counsel conceded that the crimes occurred as defendant described them in her statements and argued that the murders were not executions. Defense counsel argued that with respect to the charge involving the robbery of Gleason, the jury should return a verdict of guilty on the lesser offense of theft and should find not true the allegation that the murder of Gleason took place during the commission of a robbery. Defense counsel also

urged that as to the charge involving the attempted murder of Marks, the jury should return a verdict of guilty on the lesser offense of assault with a firearm.

### B. *Penalty Phase*

At the penalty phase of the trial, the prosecution presented victim impact evidence. Esparza's sister and aunt, with whom he was residing at the time of his death, testified about the type of person he was and their relationship with him. Other relatives who resided in Mexico at the time of Esparza's death—his parents, a sister, and a brother—also testified. Gleason's two brothers-in-law testified about the effect her death had on them and their families and, in particular, on their brother, Gleason's husband. Gleason's mother had died, and her father was hospitalized at the time of defendant's trial.

The prosecution also presented evidence establishing that defendant had attempted to escape from the county jail. This evidence was contained in tape-recorded statements made by Cindy Keshmiri, an inmate who worked on the food line at the county jail. Keshmiri told a sheriff's deputy, and later an investigator from the district attorney's office, that defendant had asked her for a metal knife. Keshmiri told the authorities that she provided defendant with a hard plastic knife, which was a type used by jail staff but not available to inmates. After Keshmiri gave her the knife, defendant asked for some aluminum foil. Keshmiri assumed that defendant wanted the foil in order to make the plastic knife look like a metal one. Keshmiri gave defendant the foil and asked whether she was planning to try to escape. In response, defendant commented that the deputies did not carry guns. Defendant added, "[W]ell, I can always take one of the inmates up to the counter where the deputies are and ask for the scissors to cut their hair." Keshmiri interpreted this comment to mean that defendant intended to hold the scissors to somebody's throat in order to escape. At that point, Keshmiri decided to report these events. Based upon the information provided by Keshmiri, defendant's cell was searched, but no knife or foil was found. At trial, Keshmiri denied having been acquainted with defendant and claimed not to recall these statements. Keshmiri's tape-recorded interviews with the deputy and the investigator were admitted into evidence as prior inconsistent statements. In addition, testimony was presented demonstrating that hard plastic items, such as the knife Keshmiri provided to defendant, can be fashioned into a sharp weapon.

In mitigation, the defense presented the testimony of a clinical psychologist, Dr. Myla Young, who testified that although defendant had an average IQ, Young's examination of defendant disclosed evidence of a brain abnormality and learning disorders. Dr. Young could not identify the cause of the

brain abnormality, which could have been caused by a genetic abnormality, trauma, or illness. According to Dr. Young, the abnormality affected the left side of defendant's brain, and interfered with her ability to "see the bigger picture," to think ahead and plan, and to be able to recognize and change behavior that is unsuccessful. Dr. Young also diagnosed defendant as having a current and long-standing depression and bipolar disorder.

Friends and neighbors testified regarding defendant's family life while growing up in a low-income housing project in Philadelphia, and regarding defendant's life in the months leading up to her commission of the crimes. According to a next-door neighbor from Philadelphia, defendant as a girl frequently was left in charge of her younger brothers and sisters and on occasion she and her siblings were locked out of the house. At times, the children had nothing to eat and defendant had to ask a neighbor for food. Through a common wall, the neighbor could hear defendant's mother beating her. As a child, defendant was anxious and withdrawn. A cousin who resided with the family for two years recalled that defendant's mother seldom was present, and the cousin saw defendant's father only twice. When defendant's mother was home, she beat defendant and sometimes beat the other children.

At the time she committed the crimes, defendant was residing with her partner, Jackie, and Jackie's three children in an apartment in East Palo Alto. Defendant had been working as a janitor but became unemployed in the latter half of 1991. At that time, according to her former employer, her behavior changed—she was less cheerful, began to gain weight, stayed home, and no longer engaged in activities in the neighborhood. Defendant attempted to support Jackie and her children and often took care of the children. Jackie made frequent financial and emotional demands on defendant.

A psychiatrist, Dr. George Woods, testified that defendant was genetically predisposed to depression and had "environmental difficulties," and that both conditions contributed to her mental state at the time of the charged offenses. Defendant reported to Dr. Woods that between the ages of seven and 14 years, she regularly had been sexually abused by her father. When she was 14 years of age, she became pregnant with her father's child and had an abortion. Defendant and her younger siblings suffered from parental abuse and neglect, and she took care of them. In Dr. Woods's opinion, defendant at the time she committed the crimes suffered from profound depression. She experienced increasing economic pressure and was unable to provide adequately for her family. She felt worthless and hopeless, and had become withdrawn and isolated.

## II. Discussion

### A. *The Search of Defendant's Apartment*

Defendant contends the trial court erred in denying her motion to suppress the evidence seized during three separate searches of her home and to suppress her confessions, which were obtained by exploiting officers' observations of items that had been viewed during the first, assertedly unlawful, search.

Defendant's apartment initially was searched pursuant to a warrant obtained by the Los Altos Police Department, which was investigating two commercial burglaries unrelated to the present case. In executing the search warrant, the Los Altos officers were accompanied by officers from the Palo Alto Police Department, who were investigating the homicide of Gleason. While inside defendant's apartment, the Palo Alto officers observed (but did not seize) items in plain view that connected defendant to the Gleason offense. The initial search was suspended and, based upon their observations, the Palo Alto police obtained a second warrant to search the apartment for evidence connecting defendant to the homicide of Gleason. During this second search, the police seized evidence connecting defendant to that killing. In addition, during the interrogation of defendant, officers confronted her with some of the evidence related to the Gleason homicide observed in her apartment during the initial search. Eventually, defendant confessed to killing Gleason and Esparza and to shooting Marks. Based upon defendant's confession, the Redwood City police then obtained a warrant to search for evidence pertaining to the homicide of Esparza and the shooting of Marks. During the third search, the Redwood City police seized additional evidence.

Prior to trial, defendant filed a motion pursuant to Penal Code section 1538.5 to suppress evidence seized during the searches of her home, including items that belonged to the homicide victims, the gun used in all three shootings, and other incriminating physical evidence. Defendant also sought to suppress her confessions, on the ground that they were fruits of the assertedly illegal initial entry and search.

The trial court denied defendant's motion, finding that the initial search warrant obtained by the Los Altos Police Department was supported by probable cause and that, even if it were not, the officers had proceeded in good faith. The trial court further determined that the first search was part of a legitimate investigation and not merely a pretext to look for evidence of other crimes. The court determined that the Palo Alto officers who accompanied the Los Altos officers were present because of their interest in the Gleason homicide, but they properly limited their activities to observing

items in plain view. Consequently, the trial court found, no illegality tainted the second and third searches or defendant's confessions. Defendant unsuccessfully challenged the court's ruling by filing a petition for writ of mandate in the Court of Appeal and unsuccessfully renewed her motion to suppress the evidence at trial. Evidence seized from defendant's home was admitted at the trial, as were her confessions.

### 1. *Probable cause for issuance of the warrant*

■ Defendant contends the affidavit supporting the initial Los Altos Police Department search warrant was insufficient for two reasons: (1) it did not establish a sufficient likelihood that contraband or evidence of the subject crimes would be found at defendant's home; and (2) the information in the affidavit was too stale to establish probable cause. These arguments lack merit.

■ In reviewing a search conducted pursuant to a warrant, an appellate court inquires "whether the magistrate had a substantial basis for concluding a fair probability existed that a search would uncover wrongdoing." (*People v. Kraft* (2000) 23 Cal.4th 978, 1040 [99 Cal.Rptr.2d 1, 5 P.3d 68], citing *Illinois v. Gates* (1983) 462 U.S. 213, 238–239 [76 L.Ed.2d 527, 103 S.Ct. 2317].) "The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him [or her], including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." (*Illinois v. Gates, supra*, 462 U.S. at p. 238.) The magistrate's determination of probable cause is entitled to deferential review. (*People v. Kraft, supra*, 23 Cal.4th at p. 1041, citing *Illinois v. Gates, supra*, 462 U.S. at p. 236.)

Probable cause sufficient for issuance of a warrant requires a showing that makes it " 'substantially probable that there is specific property lawfully subject to seizure presently located in the particular place for which the warrant is sought.' " (*People v. Frank* (1985) 38 Cal.3d 711, 744 [214 Cal.Rptr. 801, 700 P.2d 415], quoting *People v. Cook* (1978) 22 Cal.3d 67, 84, fn. 6 [148 Cal.Rptr. 605, 583 P.2d 130].) That showing must appear in the affidavit offered in support of the warrant. (*People v. Frank, supra*, 38 Cal.3d at p. 744.) Defendant urges that the affidavit was deficient in failing to provide the necessary connection between each of the two crimes under investigation and the likelihood of finding evidence in defendant's home.

The affidavit in support of the warrant obtained by the Los Altos Police Department stated the following. Defendant previously had worked as a janitor at Blackard Designs, located at 289 South San Antonio Road, Los

Altos, in Santa Clara County. In December of 1991, defendant was fired from her job for stealing checks from offices in which she performed janitorial services. On the night of January 7, 1992, Blackard Designs was burglarized and a single blank check was stolen. On January 7 or 8, 1992, a nearby business, NDN Enterprises, located at 283 South San Antonio Road, was burglarized and two blank checks were stolen. Entry into NDN Enterprises was accomplished by removal of the hinge pins on the exterior door. On January 10, 1992, Christopher Mladineo attempted to cash the Blackard Designs check, which had been made out to him in the amount of $2,000. On March 16, 1992, Mladineo was arrested and told authorities that defendant had given him the check and asked him to cash it for her because she lacked proper identification. On March 16, 1992, officers had Mladineo make a pretextual telephone call to defendant, during which defendant admitted she had stolen the Blackard Designs check.[2] On March 19, 1992, an officer spoke with defendant's former employer who reported that, as part of her employment, defendant had a master key to 289 South San Antonio Road, and it was possible she had duplicated that key. As of March 20, 1992, the checks stolen from NDN Enterprises still were outstanding and no attempt had been made to cash them.

The affidavit provided sufficient probable cause to support the belief that defendant had burglarized Blackard Designs and NDN Enterprises and that evidence from those crimes—including a key to Blackard Designs and the checks stolen from NDN Enterprises—could be found at defendant's residence. The affidavit explicitly sets forth strong and specific evidence linking defendant to the Blackard Designs burglary. Based upon all the facts stated in the affidavit, a magistrate making a practical, commonsense decision, in light of all the facts set forth in the affidavit, could conclude with a fair probability that the person who burglarized Blackard Designs was the same person who burglarized NDN Enterprises: the two businesses were located in close proximity to each other, both businesses were burglarized on or about the same date, and in both burglaries blank checks were stolen.

---

[2] Defendant notes that the affidavit also states—incorrectly—that, during the telephone call with Mladineo, defendant admitted she still had a key to the building at 289 South San Antonio Road. During the telephone call, she admitted stealing the check, but did not say she had a key or that she had burglarized the building. She stated that she had performed janitorial work there, that the checks were "always accessible to me" and that she "just helped myself to [one]." Defendant does not, however take the position that the inclusion of false information rendered the warrant invalid. The transcript of the telephone call, containing the correct information, was referenced in and attached to the warrant application. Consequently, in reviewing the sufficiency of the warrant, we shall disregard the assertion that defendant admitted she had a key to Blackard Designs. (See *Franks v. Delaware* (1978) 438 U.S. 154, 155–156 [57 L.Ed.2d 667, 98 S.Ct. 2674]; *People v. Bradford* (1997) 15 Cal.4th 1229, 1297 [65 Cal.Rptr.2d 145, 939 P.2d 259].)

■ The facts stated in the affidavit established a fair probability that the police would find evidence from the burglaries in defendant's residence. This court noted in *People v. Gonzalez* (1990) 51 Cal.3d 1179, 1206 [275 Cal.Rptr. 729, 800 P.2d 1159], that " '[a] number of California cases have recognized that from the nature of the crimes and the items sought, a magistrate can reasonably conclude that a suspect's residence is a logical place to look for specific incriminating items. [Citations.]' *(People* v. *Miller* (1978) 85 Cal.App.3d 194, 204 [149 Cal.Rptr. 204]; see also *People* v. *Superior Court (Brown)* (1975) 49 Cal.App.3d 160, 167–168 [122 Cal.Rptr. 459].)" When property has been stolen by a defendant and has not yet been recovered, a fair probability exists that the property will be found at the defendant's home. (See *People v. Stout* (1967) 66 Cal.2d 184, 192–193 [57 Cal.Rptr. 152, 424 P.2d 704]; *U.S. v. Maestas* (5th Cir. 1977) 546 F.2d 1177, 1180.) Here, defendant at one time possessed a key to the Blackard Designs building. According to defendant's employer, defendant had the opportunity to make a copy of that key. Additionally, the two checks stolen from NDN Enterprises still were outstanding at the time of the search. As the affiant observed based upon his training and experience, "subjects who steal checks with the intent to commit forgeries will maintain possession of those stolen checks until they can be cashed." It was reasonable to conclude that defendant's residence was the most likely place to find these items.

Defendant contends there was no substantial evidence indicating that she possessed a key to Blackard Designs at the time the warrant was obtained. To the contrary, the affidavit contained circumstantial evidence indicating that such a key was in her possession: at one time defendant possessed a master key to Blackard Designs and had the opportunity to duplicate it before her employment there was terminated. The check was stolen during the month after defendant's termination; she had been in possession of the check and had attempted to have it cashed, and there was no indication of forced entry in the burglary of Blackard Designs. A key is the type of item one reasonably could expect a defendant to keep at home. The showing required in order to establish probable cause is less than a preponderance of the evidence or even a prima facie case. *(Illinois v. Gates, supra,* 462 U.S. at p. 235.) The facts stated in the affidavit are sufficient to establish probable cause that defendant duplicated the master key to 289 South San Antonio Road, used it to gain access to the building following her termination, and continued to keep it in her home.

■ In the alternative, defendant contends that the information contained in the affidavit was too stale to provide probable cause for issuance of the search warrant, which occurred two months after the alleged burglaries. No bright-line rule defines the point at which information is considered stale. *(People v. Brown* (1985) 166 Cal.App.3d 1166, 1169 [212 Cal.Rptr. 907].) Rather, "the question of staleness depends on the facts of each case."

(*People v. Gibson* (2001) 90 Cal.App.4th 371, 380 [108 Cal.Rptr.2d 809].) "If circumstances would justify a person of ordinary prudence to conclude that an activity had continued to the present time, then the passage of time will not render the information stale." (*People v. Hulland* (2003) 110 Cal.App.4th 1646, 1652 [2 Cal.Rptr.3d 919].)

Courts have upheld warrants despite delays between evidence of criminal activity and the issuance of a warrant, when there is reason to believe that criminal activity is ongoing or that evidence of criminality remains on the premises. (See, e.g., *People v. Superior Court (Bingham)* (1979) 91 Cal.App.3d 463 [154 Cal.Rptr. 157] [affidavit of a fire marshal indicated that three items of property allegedly destroyed in a fire had been in the defendant's continuous control for many months after the fire, and there was no reason to conclude that the defendant had disposed of such property during the few days between execution of the affidavit and the last day on which the property had been seen in his possession]; *People v. Superior Court (Brown)*, *supra*, 49 Cal.App.3d at p. 167 [affidavit established probable cause to believe stolen items were in the defendant's residence one month after a burglary, where stolen items included credit cards and small antiques, "items which would require protection from the elements and fortuitous harm"]; *U.S. v. Jacobs* (9th Cir. 1983) 715 F.2d 1343 [affidavit was sufficient to support issuance of a search warrant for articles of clothing worn during a bank robbery, even though nearly four months had passed between the earliest bank robbery in which the clothing had been worn and the issuance of the warrant].) In the present case, the checks from NDN Enterprises still were outstanding two months after the burglary. In view of the nature of the items sought—the outstanding checks still could be forged and cashed, and a key to Blackard Designs still could be useful to defendant—there existed a fair probability that these stolen items remained at defendant's residence despite the passage of time.

### 2. *Execution of the search warrant*

Defendant maintains that even if the search warrant obtained by the Los Altos police was valid, the initial search of her home was conducted in an unlawful manner because the Los Altos Police Department delegated execution of the warrant to members of the Palo Alto Police Department, who used the warrant merely as a pretext to gain access to her apartment in order to search for evidence pertaining to the homicides. Defendant contends that the two subsequent searches as well as her confessions were tainted by the illegality of the first search.

On March 20, 1992, detectives from the Palo Alto Police Department held an interagency meeting with law enforcement personnel from several jurisdictions, including Los Altos, Redwood City, and San Carlos. The purpose of the

meeting was to coordinate the investigations of several crimes the authorities believed defendant had committed. Later that same day, Palo Alto officers accompanied the Los Altos officers when the latter officers executed the Los Altos warrant at defendant's residence.

The warrant authorized the officers to search for keys, checks in the name of NDN Enterprises, and evidence of occupancy and control of the apartment. Los Altos Police Detective Maculay and Palo Alto Police Sergeant Zook testified that the officers entered defendant's residence for the purpose of serving the Los Altos warrant. Sergeant Zook and Palo Alto Police Detective Hennessy accompanied the Los Altos officers on their search in order to ensure that the latter officers would not overlook, damage, or interfere with any evidence related to the Gleason homicide. At Sergeant Zook's request, the officers conducted a plain view search of the residence. During the search, Sergeant Zook and Detective Hennessy observed in plain view items of evidence related to the Gleason homicide. Upon making these observations, Sergeant Zook requested that the Los Altos officers suspend their search so that the Palo Alto police could seek their own search warrant. No items of evidence were seized from defendant's apartment at that time.

In the meantime, Palo Alto and Redwood City police officers questioned defendant concerning the Gleason homicide. Among other things, the officers confronted her with their observations in her apartment of the items of evidence related to the Gleason homicide. Defendant eventually confessed to killing Gleason. Hours later, she confessed to killing Esparza and to shooting Marks.

At approximately 1:38 a.m. on March 21, 1992, Palo Alto police officers obtained a warrant authorizing them to search defendant's residence for evidence related to the Gleason homicide. The affidavit supporting issuance of that warrant included the information that a pager belonging to Gleason and a key to the building in which she was killed had been observed during the earlier search. While conducting the second search, Palo Alto police officers seized the pager, the key, Gleason's purse, a metal petty cashbox missing from Gleason's office, a handgun, and four spent bullet casings. Between 4:00 a.m. and 5:00 a.m. on the same day, Los Altos police officers completed their search of defendant's residence pursuant to the warrant they had obtained, but did not seize any property.

At approximately 7:00 a.m. on that same day, Redwood City police officers executed their own warrant authorizing them to search defendant's residence for evidence related to the homicide of Esparza and the nonfatal shooting of Marks. The affidavit submitted in support of the issuance of that warrant did not contain any reference to the earlier searches conducted by the Los Altos

or Palo Alto Police Departments, but did refer to defendant's confession. Redwood City police officers seized several items of evidence related to the shooting of Marks, including keys and medical supplies.

In ruling on a motion to suppress the fruits of an allegedly unlawful search, the trial court "sits as a finder of fact with the power to judge credibility, resolve conflicts, weigh evidence, and draw inferences." (*People v. Laiwa* (1983) 34 Cal.3d 711, 718 [195 Cal.Rptr. 503, 669 P.2d 1278].) When reviewing a trial court's denial of a motion to suppress evidence obtained pursuant to a warrant, "[w]e defer to the trial court's factual findings, express or implied, where supported by substantial evidence. In determining whether, on the facts so found, the search or seizure was reasonable under the Fourth Amendment, we exercise our independent judgment. [Citations.]" (*People v. Glaser* (1995) 11 Cal.4th 354, 362 [45 Cal.Rptr.2d 425, 902 P.2d 729]; see *People v. Weaver* (2001) 26 Cal.4th 876, 924 [111 Cal.Rptr.2d 2, 29 P.3d 103].)

■ The federal Constitution controls in deciding issues pertaining to the exclusion of evidence under the Fourth Amendment. (*In re Lance W.* (1985) 37 Cal.3d 873, 890, 896 [210 Cal.Rptr. 631, 694 P.2d 744].) "The warrant clause of the Fourth Amendment expressly provides that no warrant may issue except those 'particularly describing the place to be searched, and the persons or things to be seized.' [Citations.]" (*People v. Bradford, supra*, 15 Cal.4th at p. 1291.)

Officers executing a warrant may seize items of evidence or contraband not listed in the warrant but observed in plain view. "The plain-view doctrine permits, in the course of a search authorized by a search warrant, the seizure of an item not listed in the warrant, if the police lawfully are in a position from which they view the item, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object." (*People v. Bradford, supra*, 15 Cal.4th at pp. 1293–1294.) Thus, "[w]here an officer has a valid warrant to search for one item but merely a suspicion, not amounting to probable cause, concerning a second item, that second item is not immunized from seizure if found during a lawful search for the first item." (*Id.* at p. 1294.)

In the present case, officers from the Los Altos and Palo Alto Police Departments lawfully entered defendant's residence to execute the warrant obtained by the Los Altos Police Department officers. In the course of surveying the objects in plain view in the common areas of the apartment, the officers observed two items of evidence relating to the Gleason homicide: a key clearly labeled with the address of the office building in which Gleason was killed, and a black pager with a sticker bearing the victim's pager

number. Without seizing any items of evidence, the officers suspended the search and sought a second warrant. Therefore, in their application for the second search warrant, the officers properly could recite what they had observed in plain view.

■ The search initiated by the Los Altos police officers was not rendered invalid by the circumstance that Palo Alto officers accompanied them in anticipation of locating evidence related to the Gleason homicide. Officers from another jurisdiction may accompany officers conducting a search pursuant to a warrant without tainting the evidence (pertaining to crimes that are the subject of their own investigation) uncovered in the process, even when the officers lack probable cause to support issuance of their own search warrant. (*U.S. v. Van Dreel* (7th Cir. 1998) 155 F.3d 902, 903–905 [drug task force officers properly accompanied state officers on a search for evidence of hunting law violations (conducted pursuant to a warrant)]; *U.S. v. Ewain* (9th Cir. 1996) 88 F.3d 689, 693 [postal inspector properly accompanied officers on a search conducted pursuant to a warrant]; *U.S. v. Bonds* (6th Cir. 1993) 12 F.3d 540, 571 [federal agent accompanied state agents acting under a warrant].) ■ Additionally, the discovery of evidence unrelated to the evidence sought in a warrant need not be inadvertent. "If a police officer has a valid warrant for one item, and 'fully expects' to find another, based upon a 'suspicion . . . whether or not it amounts to probable cause,' the suspicion or expectation does not defeat the lawfulness of the seizure." (*U.S. v. Ewain, supra*, 88 F.3d at p. 693; quoting *Horton v. California* (1990) 496 U.S. 128, 138–139 [110 L.Ed.2d 112, 110 S.Ct. 2301]; accord, *People v. Bradford, supra*, 15 Cal.4th at p. 1294 [discovery of evidence of a crime in plain view need not be inadvertent].)

Defendant acknowledges these principles, but maintains the search violated her Fourth Amendment rights because the Los Altos police officers obtained a warrant to search for items relating to two burglaries when they actually intended to permit officers from another jurisdiction to conduct a general search for evidence of other crimes. The trial court found that the Los Altos officers were, at the time, conducting a legitimate investigation into the two commercial burglaries committed within their jurisdiction and that they did not seek the warrant related to those burglaries merely as a pretext to facilitate a general search for evidence related to the homicides.

We uphold a trial court's credibility determinations and factual findings on appeal if supported by substantial evidence. (*People v. Loewen* (1983) 35 Cal.3d 117, 123 [196 Cal.Rptr. 846, 672 P.2d 436].) Detective Ronald Barfield of the Los Altos Police Department, who testified at the hearing, described his investigation into the two burglaries, which included arranging the telephone call between Mladineo and defendant intended to obtain an

admission of her involvement in one of the burglaries. The telephone call took place on March 16, 1992, and the officers obtained the warrant on the morning of March 20, 1992. Substantial evidence supports the trial court's findings that the Los Altos officers were conducting a legitimate investigation into the two commercial burglaries committed in their jurisdiction.

██ Even assuming the officers who conducted the initial search hoped to find evidence of other offenses, their subjective state of mind would not render their conduct unlawful. Courts must examine the lawfulness of a search under a standard of objective reasonableness without regard to the underlying intent or motivation of the officers involved. (*Scott v. United States* (1978) 436 U.S. 128, 137–138 [56 L.Ed.2d 168, 98 S.Ct. 1717].) The existence of an ulterior motivation does not invalidate an officer's legal justification to conduct a search. (*Whren v. United States* (1996) 517 U.S. 806, 813 [135 L.Ed.2d 89, 116 S.Ct. 1769]; *People v. Woods* (1999) 21 Cal.4th 668, 678–680 [88 Cal.Rptr.2d 88, 981 P.2d 1019].) "That the . . . officer might have hoped to find evidence [not listed in the warrant] is irrelevant to the Fourth Amendment analysis under *Whren,* because once probable cause exists, and a valid warrant has been issued, the officer's subjective intent in conducting the search is irrelevant." (*U.S. v. Van Dreel, supra,* 155 F.3d at p. 905.) The court simply asks "whether the police confined their search to what was permitted by the search warrant." (*U.S. v. Ewain, supra,* 88 F.3d at p. 694.) In the present case, the police did not exceed the scope of the search authorized by the warrant, and they observed Gleason's property in plain view in defendant's home. These observations were lawful because the presence of the officers at the location where the observations were made was lawful, regardless of the officers' motivations.

B. *Admissibility of Defendant's Confessions*

Defendant contends the trial court erred in denying her motion to suppress her confessions to the murders of Caroline Gleason and Victor Esparza on the ground that her statements were involuntary. At approximately 5:15 p.m. on March 20, 1992, defendant was arrested at her home in San Mateo County and taken to the Redwood City Police Department. Between approximately 7:55 p.m. and 3:50 a.m., defendant was separately interrogated by the Palo Alto, Redwood City, and San Carlos Police Departments. During these three interviews, defendant confessed to the murder of Caroline Gleason, the burglary and attempted murder of Dr. Marks, and the murder of Victor Esparza.

The trial court denied defendant's motion to exclude her statements to the police, concluding they were voluntarily made. The trial court found that no implied promises were made to defendant and characterized the interviews as

"a discussion about sleeping better, getting something off your chest or weight off your shoulders." For the reasons discussed below, we conclude that the trial court did not err in denying defendant's motion to suppress her confessions.

### 1. *The Murder of Caroline Gleason*

■ Defendant asserts that the police officers persuaded defendant that she would receive lenient treatment if she confessed to murdering Gleason. An involuntary confession may not be introduced into evidence at trial. (*Lego v. Twomey* (1972) 404 U.S. 477, 483 [30 L.Ed.2d 618, 92 S.Ct. 619].) The prosecution has the burden of establishing by a preponderance of the evidence that a defendant's confession was voluntarily made. (*Id.* at p. 489; *People v. Williams* (1997) 16 Cal.4th 635, 659 [66 Cal.Rptr.2d 573, 941 P.2d 752].) In determining whether a confession was voluntary, " '[t]he question is whether defendant's choice to confess was not "essentially free" because his [or her] will was overborne.' " (*People v. Massie* (1998) 19 Cal.4th 550, 576 [79 Cal.Rptr.2d 816, 967 P.2d 29].) Whether the confession was voluntary depends upon the totality of the circumstances. (*Withrow v. Williams* (1993) 507 U.S. 680, 693–694 [123 L.Ed.2d 407, 113 S.Ct. 1745]; *People v. Massie, supra,* 19 Cal.4th at p. 576.) " 'On appeal, the trial court's findings as to the circumstances surrounding the confession are upheld if supported by substantial evidence, but the trial court's finding as to the voluntariness of the confession is subject to independent review.' " (*People v. Holloway* (2004) 33 Cal.4th 96, 114 [14 Cal.Rptr.3d 212, 91 P.3d 164].)

During the initial interview, Palo Alto Police Detective John Lindsay and Redwood City Police Sergeant Jon Sherman interrogated defendant for approximately two and one-half hours. After Lindsay provided defendant with admonitions required by *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602], defendant agreed to speak with the officers. Lindsay began by informing defendant that she had been arrested pursuant to a warrant related to a Los Altos burglary, but that he also wanted to speak with her concerning her possible involvement in a homicide committed at 777 California Avenue in Palo Alto. Later, Sergeant Sherman told defendant that if she cooperated during the interview, the officers "would try to explain this whole thing with, with Los Altos P.D. as [best] we can." He continued: "I have no control over that. I'm in Redwood City here. Um, and, and I don't know what entailed um, in that case involving you in the burglary. I wish I could so I could explain it to you more fully. Uh, so that you know exactly where your [*sic*] stand is (unintelligible). I would hope that you would try to push that away so that we could get through with what we're doing right now. Can you do that for us?" Defendant replied: "Yeah. I guess so." Later during the interview, the officers strategically confronted defendant with

items recovered from her residence such as the key to the building where Gleason's body was found, and Gleason's pager. Sergeant Sherman also informed defendant that defendant's neighbor had called defendant on Gleason's pager number, and that a video surveillance camera revealed that she had been present at the 7-Eleven convenience store where the victim's ATM card was used. Defendant denied involvement in the Gleason homicide.

Detective Lindsay then told defendant that "what happened out there at 777 California was probably an accident" and that there could be mitigating circumstances: "What if she scared you? She confronted you. Or maybe there was someone else with you." Lindsay continued: "It's like a cancer. And what you've gotta do is to go out and purge yourself of that. You've got to get that off your shoulders. Not just for you but, for Jackie, for those three kids. You've got an incredible weight on your shoulders right now. An incredible weight that you've been carrying around for quite some time. And it's time." Soon after, defendant confessed to the burglary of the premises at 777 California Avenue and to Gleason's murder.

 " 'Once a suspect has been properly advised of his [or her] rights, he [or she] may be questioned freely so long as the questioner does not threaten harm or falsely promise benefits. Questioning may include exchanges of information, summaries of evidence, outline of theories of events, confrontation with contradictory facts, even debate between police and suspect. . . . Yet in carrying out their interrogations the police must avoid threats of punishment for the suspect's failure to admit or confess particular facts and must avoid false promises of leniency as a reward for admission or confession. . . .' [Citation.]" (*People v. Holloway, supra,* 33 Cal.4th at p. 115.)

The foregoing statements by Sergeant Sherman demonstrate that defendant's confession to the murder of Gleason was not prompted by any express or implied promise of leniency. First, the officer's statement that he would help defendant in explaining "this whole thing" to the Los Altos police did not constitute a promise of leniency when considered in the context both of defendant's prior questions as to why she was arrested and Sherman's subsequent disclaimer of any control over (or information concerning) the Los Altos burglary investigation. In this context, Sergeant Sherman simply stated that he would attempt to obtain more information pertaining to the Los Altos burglary in order to assist defendant in determining her status with respect to that crime.

Second, we conclude that defendant's confession was not prompted by Sergeant Sherman's comments. Defendant confessed approximately one hour after his comments were made. During the interview, defendant was confronted with incriminating evidence that had been recovered at defendant's

residence as well as other information linking her to the murder of Gleason, which apparently prompted her to confess to this crime.

Defendant also contends that Detective Lindsay's assurances that the police merely were attempting to understand defendant's motivation in committing the crimes impermissibly coerced her to confess. To the contrary, Detective Lindsay's suggestions that the Gleason homicide might have been an accident, a self-defensive reaction, or the product of fear, were not coercive; they merely suggested possible explanations of the events and offered defendant an opportunity to provide the details of the crime. This tactic is permissible. (*People v. Holloway, supra,* 33 Cal.4th at p. 115.) Moreover, any benefit to defendant that reasonably could be inferred from the substance of Detective Lindsay's remarks was " ' "merely that which flows naturally from a truthful and honest course of conduct," ' " because the particular circumstances of a homicide can reduce the degree of culpability, and thus minimize the gravity of the homicide or constitute mitigating factors in the ultimate decision as to the appropriate penalty. (*Ibid.*)

Defendant's confession to the Gleason homicide was not coerced by threats or false promises, but was given freely and voluntarily.

### 2. *The Murder of Victor Esparza*

Defendant alleges that her confession to the murder of Victor Esparza should have been suppressed because it was not made freely and voluntarily, but instead was induced by (1) misleading statements concerning the extent of defendant's exposure to criminal liability, (2) improper promises of leniency, (3) her unduly prolonged interrogation, and (4) improper appeals to her religious convictions. Viewed under the totality of the circumstances, defendant's confession was the product of her free will.

As an initial matter, defendant urges that deceptive comments made by the officers at the conclusion of the second interview relating to the nature of the charges and the potential punishment facing defendant coerced her into subsequently confessing to the murder of Esparza. The second interview was conducted from 11:42 p.m. to 12:52 a.m. by Sergeant Sherman and Detective Steve Blanc of the Redwood City Police Department. During this interview defendant promptly confessed to shooting Dr. Marks and to the burglary of the premises at 801 Brewster Avenue in Redwood City. Defendant does not challenge the admissibility of this confession. By the end of the interview, however, Sergeant Sherman shifted the questioning to the subject of the Esparza homicide, informing defendant that "a person was shot and killed . . . late at night" in San Carlos "[w]hen the building was unoccupied." Sherman urged defendant to confess to that crime and pointed out that "[a]t this point,

to us you have nothing else to lose" and that her admission to this homicide "wouldn't make any difference." He continued: "I want you to pretty much purge yourself of all these bad things that you've done, so at least you can start again."

Defendant claims that Sherman's statement that admitting she murdered Esparza "wouldn't make any difference" was deceptive, because a prosecutor more likely would seek—and a jury more likely would impose—a death sentence if a defendant admitted to committing two murders rather than a single murder. The use of deceptive statements during an interrogation, however, does not invalidate a confession unless the deception is " ' "of a type reasonably likely to procure an untrue statement." ' " (*People v. Jones* (1998) 17 Cal.4th 279, 299 [70 Cal.Rptr.2d 793, 949 P.2d 890]; see *People v. Thompson* (1990) 50 Cal.3d 134, 167 [266 Cal.Rptr. 309, 785 P.2d 857].) Considered in this context, the gist of Sergeant Sherman's comments was that, in view of the overwhelming evidence against defendant, her denial of participation in the Esparza homicide was unlikely to alter the outcome of the case against her. Moreover, when law enforcement officers describe the moral or psychological advantages to the accused of telling the truth, no implication of leniency or favorable treatment at the hands of the authorities arises. (*People v. Nelson* (1964) 224 Cal.App.2d 238, 251 [36 Cal.Rptr. 385].) Here, Sergeant Sherman focused on the benefit that defendant reasonably could expect from "purging [her]self"—namely, psychological and moral relief.

Furthermore, we conclude that Sergeant Sherman's comments did not affect defendant's decision to confess to the murder of Esparza, because she maintained her innocence during the remainder of the second interview and, during the third interview, revealed that she already was aware that confessing to an additional murder would increase the severity of the punishment: "You know, yeah, I'm quite sure that it might come down harder or what have you, especially this particular case here." The comments made by Sergeant Sherman during the second interview were not unduly coercive and did not amount to a promise affecting the reliability of the subsequent confession, and there is no indication that defendant relied upon those comments in deciding to confess.

The third and final interview was conducted by Detective Steve Jackson of the San Carlos Police Department, Sergeant Sherman of the Redwood City Police Department, and Detective Lindsay of the Palo Alto Police Department. The interview continued from 1:25 a.m. to 4:03 a.m., focusing upon the homicide of Esparza and the burglary committed at 1123 Industrial Road in San Carlos. In initiating the interview, the officers confronted defendant with various similarities between the San Carlos homicide and the crimes to which she had confessed earlier. The officers pointed out that the same gun was used

in all three shootings, that defendant previously had worked as a janitor in the buildings in which the killings occurred, and that the perpetrator had entered the building on Industrial Road through the same door defendant had used when she worked there as a janitor. Defendant acknowledged that "everything points to me," but refused to accept responsibility in the San Carlos case. Sergeant Sherman then explained that he wanted to present a package to the district attorney in which he would be able to say "that in all cases that you have been charged with, all the cases you've been involved with, that you helped and assisted the police in their investigation." When asked whether she was not telling the truth because she sought to avoid a harsher penalty, defendant responded: "Okay just depends on the judge and DA and how are they going to prosecute it. You know, yeah, I'm quite sure that it might come down harder or what have you, especially this particular case here."

Sergeant Sherman then introduced the possibility that the crime had been an accident, and he urged without success that defendant confess. Detective Jackson also suggested that perhaps defendant "bumped" into the victim, became frightened, and shot him as a result. Detective Lindsay then intervened, telling defendant that she was "looking at special circumstances" and that refusing to discuss the San Carlos incident would work against her. Defendant replied she was aware of that and would have to take her chances. Lindsay proceeded: "I think that you'd be hard pressed to find a public defender or a defense attorney who could look at the similarity in style, the exact same gun, the exact same bullets, and not say Celeste, if I'm going to represent you, I need to at least know if this really did happen, the one in San Carlos."

Lindsay then made the following statements, which ultimately prompted defendant's confession: "You shot that janitor in San Carlos, and we know you shot that janitor in San Carlos, and God Bless you, you can sit here and you can tell me that you didn't, there's someone up above, bigger than both of us looking down saying Celeste, you know that you shot that person in San Carlos and it's time to purge it all. It is like a cancer that is eating away at you. You felt good, I know you felt good when you told us what really happened in Palo Alto and what really happened in Redwood City, it was like a 50 [pound] weight off your shoulder." Lindsay continued: "Someone up above is looking at us, and I'll tell you what. If that big guy up there or gal is looking at us and he said hey Lindsay, you better not be selling her a lot of Bullshit, cause you won't sleep well tonight. That's what the big guy is going to say to me. He's telling me be honest with her, be straight up with her. Look her in the eyes and be straight up because if you are not, then whoever that big person is up in the sky is looking at you going, how can you look at these two guys, and how can you tell them that that didn't happen in San Carlos. You can't do it." A few moments later, defendant confessed to the murder of Victor Esparza and later explained that it had been difficult for her

to confess, because the victim did not "stumble upon" her as Detective Jackson suggested, but rather defendant "just turned and shot him."

Defendant contends that during this interview the police improperly attempted to convince her that she would receive more lenient treatment if she confessed. Defendant contends that promises of leniency were made initially, when Sergeant Sherman suggested it would be beneficial to defendant if the officers could deliver to the district attorney an "entire package" encompassing all the crimes and inform the prosecution that defendant fully cooperated with the police. Defendant contends additional promises of leniency were made when the officers suggested that they merely were interested in understanding defendant's motivations in committing the crimes and that the Esparza homicide may have been an accident because she may have "snapped" or been frightened.

The statements made by the officers did not imply that by cooperating and relating what actually happened, defendant might not be charged with, prosecuted for, or convicted of the murder of Esparza. The interviewing officers did not suggest they could influence the decisions of the district attorney, but simply informed defendant that full cooperation might be beneficial in an unspecified way. Indeed, defendant understood that punishment decisions were not within the control of the police officers. As noted above, she said it "just depends on the judge and DA and how are they going to prosecute it." Under these circumstances, Sergeant Sherman's statement that he would inform the district attorney that defendant fully cooperated with the police investigation did not constitute a promise of leniency and should not be viewed as a motivating factor in defendant's decision to confess. (See *People v. Jones, supra,* 17 Cal.4th at p. 298.)

We reject the contention that Detective Lindsay's comments relating to the prospect of special circumstances, and his suggestion that defendant's denial of responsibility for the Esparza homicide would worsen her position, represented an implied promise of leniency. The possibility that special circumstances would be alleged was realistic, because defendant already had confessed to committing a murder during the commission of a burglary. No constitutional principle forbids the suggestion by authorities that it is worse for a defendant to lie in light of overwhelming incriminating evidence. " '[M]ere advice or exhortation by the police that it would be better for the accused to tell the truth when unaccompanied by either a threat or a promise does not render a subsequent confession involuntary.' " (*People v. Howard* (1988) 44 Cal.3d 375, 398 [243 Cal.Rptr. 842, 749 P.2d 279]; see *People v. Higareda* (1994) 24 Cal.App.4th 1399, 1409 [29 Cal.Rptr.2d 763].) Here, the officers did not make statements that were coercive; they did not threaten defendant and did not specify how her continued denial of criminal involvement could jeopardize her case.

■ Defendant's contention that the police officers engaged in improper conjecture concerning the accidental nature of the killing also must be rejected. As noted in our review of the claims related to defendant's confession to the murder of Gleason, the police properly may confront, and even debate with, a suspect regarding theories based on the circumstances of the crimes and even debate with the suspect the merits of those theories. (*People v. Holloway, supra*, 33 Cal.4th at p. 115.)

Defendant's contention that Detective Lindsay improperly associated the function of the police with that of defense counsel, by telling defendant that the officers merely were attempting to obtain the same information that defense counsel would need, is not supported by the record. In essence, Detective Lindsay remarked that eventually defendant would have to tell her lawyer the truth. He did not suggest that defendant's lawyer and the district attorney would share information or use her testimony for the same purpose.

■ Defendant further contends that the period over which the series of interrogations was conducted was so lengthy that her will was overborne. A police interrogation that is prolonged may be coercive under some circumstances. (See *Mincey v. Arizona* (1978) 437 U.S. 385, 398–399 [57 L.Ed.2d 290, 98 S.Ct. 2408] [the defendant's statements to the police were not the product of a free and rational choice under the circumstances, where he was questioned for more than three hours, had been seriously wounded several hours earlier, was confused and unable to think clearly, and stated repeatedly that he did not wish to speak without having a lawyer present]; *Spano v. New York* (1959) 360 U.S. 315, 320–324 [3 L.Ed.2d 1265, 79 S.Ct. 1202] [confession made by young, emotionally unstable man after eight-hour interrogation, continued despite his requests to speak to his attorney and his repeated refusals to answer questions, was involuntary].)

In the present case, although the questioning continued over the course of eight hours, it does not appear that defendant's will to resist was overborne. The questioning was not aggressive or accusatory. Instead, the interviewing officers chose to build rapport with defendant and gain her trust in order to persuade her to tell the truth. There is no indication that defendant was induced by fear to make a statement. She appeared lucid and aware throughout the entire interrogation session and never asked the police officers to terminate the interview. Defendant spoke with confidence, and her answers were coherent. Moreover, the police repeatedly offered defendant food and beverages, provided her with four separate breaks, and allowed her to meet privately with her partner, Jackie. We conclude that under the totality of the circumstances, the length of the interrogation did not render defendant's confessions involuntary.

Finally, defendant asserts that her confession to the murder of Victor Esparza was obtained through improper appeals to religious belief, because during the interrogation Detective Lindsay stated "there's someone up above, bigger than both of us looking down saying Celeste, you know that you shot that person in San Carlos and it's time to purge it all." "[T]he tactic of exploiting a suspect's religious anxieties has been justly condemned." (*People v. Kelly* (1990) 51 Cal.3d 931, 953 [275 Cal.Rptr. 160, 800 P.2d 516]; see *People v. Adams* (1983) 143 Cal.App.3d 970, 989 [192 Cal.Rptr. 290] [confession suppressed when the interrogating officer, who attended the same church as the defendant, made repeated references to the defendant's sin, guilt, apostasy, and " 'reprobate mind' "].) When police comments are not "calculated to exploit a particular psychological vulnerability of [the] defendant," however, and "no acute religious anxiety or sense of guilt was apparent from prior questioning," appeals to religion are unlikely to be a motivating cause of a defendant's subsequent confession. (*People v. Kelly, supra,* 51 Cal.3d at p. 953.)

Here, Detective Lindsay's remarks were not calculated to exploit anxieties or vulnerabilities that might have arisen had defendant held strong religious beliefs. Religion was not discussed in prior questioning, and defendant stated no particular religious affiliation. Moreover, although the interrogation was lengthy, defendant exhibited no sign of being in a particularly fragile mental state that would render her vulnerable to manipulation by reference to religion. The substance of Detective Lindsay's comments sought to evoke defendant's better nature by persuading her that "purg[ing] it all" was morally the right thing to do and would provide her with psychological relief. Lindsay was effective in awakening defendant's sense of guilt; prior to confessing, she asked whether the detective was a counselor before joining the police force and apologized for not telling the truth earlier. After confessing, defendant volunteered that she had maintained her silence because the murder of Esparza was not an accident, as the police officers suggested, but an intentional act. "The compulsion to confess wrong has deep psychological roots, and while confession may bring legal disabilities it also brings great psychological relief." (*People v. Andersen* (1980) 101 Cal.App.3d 563, 583–584 [161 Cal.Rptr. 707], fn. omitted.) Detective Lindsay did not coerce defendant into confessing through an impermissible appeal to her religious beliefs. Because the record does not reflect coercive tactics, the trial court did not err in denying defendant's motion to suppress that evidence.

### C. Grand Jury Venire

Defendant contends that the indictment must be quashed and her convictions reversed because she was indicted by a grand jury from which persons 70 years of age and older were excluded systematically. She contends the

exclusion of such persons violated her right to a grand jury drawn from a representative cross-section of the community under the Sixth Amendment to the federal Constitution and article I, section 16 of the California Constitution. She also contends the San Mateo County Jury Commissioner's Office failed to follow state law in selecting the grand jury and thus violated her right to due process of law under the federal Constitution. (*Hicks v. Oklahoma* (1980) 447 U.S. 343, 346 [65 L.Ed.2d 175, 100 S.Ct. 2227].)

■■■ There is no exemption from jury service for elderly persons. A prospective juror may be excused from such service based upon undue hardship resulting from, among other causes, "a physical or mental disability or impairment, not affecting that person's competence to act as a juror, that would expose the potential juror to undue risk of mental or physical harm." (Cal. Rules of Court, rule 2.1008(d)(5).) A court, however, may not require a person 70 years of age or older claiming such disability to furnish verification of his or her condition. (*Ibid.*)

At a hearing held in the trial court, however, it was established that two of the deputy clerks in the San Mateo Superior Court consistently granted exemptions from jury service to all persons 70 years of age and older, whether or not they requested exemption. Other deputies did the same on occasion or exercised greater leniency in granting exemptions to those 70 years of age or older as compared with other persons. In a random sample taken of the jurors summoned during a six-week period in May and June of 1993, persons 70 years of age or older represented only 1.13 percent of the venire, although in the 1990 census, persons over the age of 70 years represented 10.42 percent of the population. At the hearing, defendant's experts testified that persons who were in this older age group at the time of defendant's trial shared distinctive outlooks and attitudes based not only upon their chronological age but also upon their common experience of having lived through World War II and the Great Depression.

■■■ A violation of the requirement that a jury be drawn from a fair cross-section of the population is established by showing "(1) that the group alleged to be excluded is a 'distinctive' group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury-selection process." (*Duren v. Missouri* (1979) 439 U.S. 357, 364 [58 L.Ed.2d 579, 99 S.Ct. 664].) ■■■ As defendant concedes, neither this court nor the United States Supreme Court has held that the Sixth Amendment right to a jury drawn from a fair cross-section of the community, applicable to a petit jury, also applies to a state *grand jury* convened for the purpose of considering issuance of an indictment. (But see

*Peters v. Kiff* (1972) 407 U.S. 493, 503–504 [33 L.Ed.2d 83, 92 S.Ct. 2163] [if a state chooses to use a grand jury, due process imposes limitations on the composition of that jury and prohibits systematic exclusion based upon race].) In addition, defendant has failed to cite any California case holding that a category composed of older persons is a distinctive group for purposes of fair-cross-section analysis or that members of a particular age category constitute a distinctive group because they experienced certain historical events in common.[3] We need not resolve these issues, however, because, even assuming the grand jury that indicted defendant was selected in violation of state law or constitutional fair-cross-section requirements, that circumstance would not require reversal of her conviction. (See *People v. Corona* (1989) 211 Cal.App.3d 529 [259 Cal.Rptr. 524] (*Corona*).)

▮▮▮▮ Generally, a conviction will not be reversed because of errors or irregularities that occurred at a preliminary hearing or grand jury proceeding, absent a showing that the asserted errors "deprived [the defendant] of a fair trial or otherwise resulted in any actual prejudice relating to [the] conviction." (*People v. Towler* (1982) 31 Cal.3d 105, 123 [181 Cal.Rptr. 391, 641 P.2d 1253] [purported irregularities in grand jury proceedings, including the admission of hearsay and improper comments by the prosecutor, did not require reversal]; see *People v. Stewart* (2004) 33 Cal.4th 425, 461–463 [15 Cal.Rptr.3d 656, 93 P.3d 271] [asserted misconduct of the prosecutor at the preliminary hearing did not require reversal of conviction absent a showing that the trial was unfair]; *People v. Pompa-Ortiz* (1980) 27 Cal.3d 519, 522 [165 Cal.Rptr. 851, 612 P.2d 941] [violation of a defendant's right to a public preliminary hearing did not compel reversal of his conviction absent a showing that the violation "in some way prejudiced defendant at his subsequent trial"]; *Corona, supra,* 211 Cal.App.3d at p. 535 [claim that the defendant's right to a grand jury selected from a fair cross-section of the community had been violated did not require reversal absent prejudice at trial]; see also *Coleman v. Alabama* (1970) 399 U.S. 1, 11 [26 L.Ed.2d 387, 90 S.Ct. 1999] [denial of the defendant's right to counsel at the preliminary hearing was subject to harmless error review].)

The United States Supreme Court, in creating an exception to the foregoing general rule, has held that purposeful racial discrimination in the selection of grand jurors, in violation of the constitutional guarantee of equal protection, requires reversal of the ensuing conviction without a showing of prejudice. (*Vasquez v. Hillery* (1986) 474 U.S. 254, 260–264 [88 L.Ed.2d 598, 106 S.Ct.

---

[3] In a case involving a challenge to San Mateo County jury selection practices based upon the same hearing underlying defendant's claim in the present case, the court in *People v. McCoy* (1995) 40 Cal.App.4th 778, 783–786 [47 Cal.Rptr.2d 599], upheld the trial court's determination that the defendant had not established that persons 70 years of age and older were a distinctive group.

617]; *Rose v. Mitchell* (1979) 443 U.S. 545, 556 [61 L.Ed.2d 739, 99 S.Ct. 2993]; *Strauder v. West Virginia* (1879) 100 U.S. 303, 308 [25 L.Ed. 664].) The high court has included among the rare forms of constitutional errors held not to be subject to harmless error analysis the "unlawful exclusion of members of the defendant's race from a grand jury." (*Arizona v. Fulminante* (1991) 499 U.S. 279, 310 [113 L.Ed.2d 302, 111 S.Ct. 1246].) That court, however, has not extended the requirement of automatic reversal to other defects in the grand jury process. (See, e.g., *United States v. Mechanik* (1986) 475 U.S. 66, 71–72 [89 L.Ed.2d 50, 106 S.Ct. 938] [violation of the rule prohibiting a grand jury witness from being present during other portions of the grand jury proceedings does not require automatic reversal]; *Hobby v. United States* (1984) 468 U.S. 339, 344–350 [82 L.Ed.2d 260, 104 S.Ct. 3093] [discrimination in selection of federal grand jury foreman does not require automatic reversal of defendant's conviction].)

The rationale for reversing a conviction without consideration of prejudice in instances of racial discrimination is that "intentional discrimination in the selection of grand jurors is a grave constitutional trespass, possible only under color of state authority, and wholly within the power of the State to prevent. Thus, the remedy we have embraced for over a century—the only effective remedy for this violation—is not disproportionate to the evil that it seeks to deter." (*Vasquez v. Hillery, supra,* 474 U.S. at p. 262, fn. omitted.) In contrast to the deliberate racial discrimination addressed in *Vasquez v. Hillery, supra,* 474 U.S. at page 262, the unwarranted exemption of some persons over the age of 70 years as a result of errors committed by court clerks is not the type of "evil" that requires or justifies the extreme remedy of automatic reversal of a criminal conviction obtained as the result of a fair trial. Indeed, in the present case the superior court's practices regarding excusal of jurors over 70 years of age were discontinued shortly before the hearing.[4]

Consequently, we agree with the Court of Appeal's decision in *Corona* that an asserted violation of the right to a grand jury drawn from a fair cross-section of the community does not require reversal of a conviction obtained after a fair trial, absent a showing of prejudice. (*Corona, supra,* 211 Cal.App.3d at p. 535.) Defendant does not attempt to demonstrate that the purported constitutional error in selecting the grand jury in her case was prejudicial, and no prejudice is apparent from the record.

---

[4] Contrary to defendant's contention, our conclusion does not leave defendants without any remedy for improper or unconstitutional practices in the selection of grand juries. They may pursue pretrial remedies, as defendant did in the present case. She challenged the trial court's ruling in the state Court of Appeal, which denied her petition for writ of prohibition and mandate. We denied review of that appellate ruling. Defendant raised the same issue in a pretrial petition for writ of habeas corpus filed in the federal district court, which she subsequently withdrew.

### D. *Jurisdiction of Grand Jury*

Defendant contends that the grand jury lacked jurisdiction to indict her because, at the time it returned the indictment, proceedings on a previously filed complaint on the same charges had been stayed. We disagree.

The prosecution originally filed, in the municipal court in San Mateo County, a complaint against defendant alleging 10 counts, including the two murders and the attempted murder of which she was convicted in the present case. Defendant pleaded not guilty to all counts and filed a demurrer alleging San Mateo County was not the proper venue for trial of the offenses committed at the workplace of Caroline Gleason, located in Santa Clara County. After the municipal court sustained the demurrer with leave to amend, the prosecution filed an amended complaint alleging that acts preparatory to the commission of the Santa Clara County crimes occurred in San Mateo County. (§ 781.) Defendant again filed a demurrer challenging venue. The municipal court overruled this demurrer and proceeded to set a preliminary hearing date. Defendant then filed a petition for writ of prohibition in the superior court challenging venue for the offenses committed in Santa Clara County, and Presiding Judge Shelton issued an order to show cause and a stay of all proceedings in the municipal court.

While the writ proceeding was still pending, the prosecutor initiated a grand jury proceeding, and that body subsequently returned an indictment against defendant that included the counts previously charged in the complaint as well as additional counts of burglary. Similarly to the amended complaint, the indictment alleged that "preparatory acts" to the Santa Clara County offenses occurred in San Mateo County, and that property taken during the commission of those offenses was brought to San Mateo County. Over defendant's objection, the superior court vacated the stay of the municipal court proceedings. The municipal court dismissed the amended complaint, and defendant was arraigned on the indictment. Defendant filed a demurrer to the indictment, challenging venue with regard to the offenses committed in Santa Clara County. Defendant also moved to dismiss the indictment on the ground that the grand jury lacked authority to return an indictment because proceedings on the complaint were pending and had been stayed. The trial court overruled the demurrer and denied the motion to dismiss the indictment.

Defendant contends the grand jury, as an "arm of the superior court," lacked authority to act as long as the stay was in effect. To the contrary, neither the pendency of the complaint nor the stay of proceedings on that complaint affected the jurisdiction of the grand jury. In the prosecution of a felony, the People may proceed "either by indictment or . . . by

information." (Cal. Const., art. I, § 14; see Pen. Code, §§ 682, 737.) It is within the discretion of the prosecution to accept dismissal of a complaint and begin new proceedings by seeking an indictment. (*People v. Uhlemann* (1973) 9 Cal.3d 662, 664, 669 [108 Cal.Rptr. 657, 511 P.2d 609].) After a complaint has been filed, the prosecution is not prohibited from seeking an indictment on the same charges, even prior to dismissal of the complaint. (*Sherwood v. Superior Court* (1979) 24 Cal.3d 183, 187 [154 Cal.Rptr. 917, 593 P.2d 862] [grand jury did not lack jurisdiction to indict the defendant while a complaint was pending against him on the same charge].)

The stay issued by the superior court did not affect the prosecution's right to seek an indictment. That order stayed "all proceedings in the Municipal Court of this county on the case of The People v. Celeste Simone Carrington, CRSf239675." An indictment and an information initiate "separate proceedings." (*People v. Combes* (1961) 56 Cal.2d 135, 145 [14 Cal.Rptr. 4, 363 P.2d 4] [error committed in connection with the complaint does not affect subsequent proceedings under an indictment for the same charges]; see *People v. Grace* (1928) 88 Cal.App. 222, 228 [263 P. 306] ["The mere fact that the same offense was charged in the indictment that had previously been charged in the information does not establish any legal relation or connection between the information and the indictment . . . and manifestly no error committed in connection with the one proceeding could affect the other."].) The stay simply did not apply to any potential grand jury proceedings in the superior court.

Defendant also contends that the prosecutor's action in convening a grand jury while a stay was in effect constituted unfair and unconstitutional forum shopping, violating her rights to due process and fundamental fairness. By seeking an indictment, the prosecution may have avoided some delay in obtaining a probable cause determination while defendant's venue challenge to the complaint was being litigated. The prosecution, however, did not obtain any unfair advantage in doing so. It did not avoid a ruling on the venue issue. Defendant demurred to the indictment, alleging that San Mateo County was not a proper venue for trial of the Santa Clara County offenses, and the superior court overruled that demurrer. (See §§ 917, 1004, subd. 1.) The prosecutor's decision to pursue an indictment was not unlawful and did not result in any unfair advantage over the defense. Consequently, defendant's constitutional rights were not violated.

E. *Venue in San Mateo County for the Gleason Homicide*

Defendant contends the indictment was facially deficient because it failed to allege facts establishing that San Mateo County was a proper county in which to try the Gleason homicide charges. She claims that therefore the indictment must be quashed, her conviction for Gleason's murder must be

reversed, and the special circumstance findings and death sentence must be set aside. Defendant further contends that the evidence presented at trial was insufficient to establish that San Mateo County had territorial jurisdiction over those charges, and that conducting her trial in that county violated her Sixth Amendment right to be tried in the district in which the crime was committed. (U.S. Const., 6th & 14th Amends.)

Gleason was killed in Santa Clara County. The indictment alleged that "acts preparatory to the commission" of the burglary and the robbery and murder of Gleason occurred in San Mateo County and that "property taken in the commission" of those crimes was brought into San Mateo County. In overruling defendant's demurrer, the trial court concluded that the indictment sufficiently alleged that venue was proper in San Mateo County.[5]

Defendant contends the foregoing allegations in the indictment were insufficient because the charging document failed to allege specific facts, including the nature of the preparatory acts she engaged in and the fruits of the homicide that were brought into San Mateo County. Defendant urges that the absence of more specific allegations violated the pleading requirements of California law. (§ 959.) She further contends the absence of specific allegations violated her federal constitutional right to be adequately informed of the nature of the accusation against her. (U.S. Const., 6th & 14th Amends.)

■ The trial court's ruling was correct. An indictment may employ "ordinary and concise language without any technical averments or any allegations of matter not essential to be proved." (§ 952.) The offense may be alleged "in the words of the enactment describing the offense . . . or in any words sufficient to give the accused notice of the offense of which he [or she] is accused." (*Ibid.*) An indictment is "sufficient if it contains[,] in substance, a statement that the accused has committed some public offense therein specified" (*ibid.*) and if it can be understood "[t]hat the offense charged therein is triable in the court in which it is filed" (§ 959, subd. 5).

Generally, an offense is triable in the county in which a crime was committed. (§ 777.) If a crime was committed in part in one county and in part in another county, venue is proper in either. (§ 781.) "Under section 781, a public offense may be tried in a jurisdiction in which the defendant made preparations for the crime, even though the preparatory acts did not constitute an essential element of the crime." (*People v. Price* (1991) 1 Cal.4th 324, 385 [3 Cal.Rptr.2d 106, 821 P.2d 610].)

[5] Defendant filed a petition for writ of prohibition and mandate in the Court of Appeal challenging this ruling of the trial court. The petition was denied on May 19, 1993. We denied a petition for review on August 2, 1993.

Section 952 specifically provides that the crime itself may be alleged in the words of the statute that defines it. There is no reason why allegations related to venue need be more specific. In support of her assertion that the allegations of the indictment must include specific facts, rather than "blanket conclusions," defendant relies upon cases that are inapposite. In *Ball v. United States* (1891) 140 U.S. 118, 136 [35 L.Ed. 377, 11 S.Ct. 761], the high court relied upon common law requirements that an accusatory pleading in a homicide prosecution specify the time and place of death—facts that were critical to the determination of the trial court's jurisdiction. In *People v. Wakao* (1917) 33 Cal.App. 454 [165 P. 720], the defendant was charged with criminal libel, which at that time could be tried in the county in which the complaining witness resided when the defamatory statements were circulated. The information alleged that defamatory statements were published in a newspaper circulated in Sacramento County, but did not allege that the complaining witness resided in that county. Thus, the critical allegations were missing entirely from the accusatory pleading. The *Ball* and *Wakao* cases clearly are distinguishable from the present case and are not authority for the proposition that an indictment must allege specific facts demonstrating that venue is proper.

A simple allegation that an offense was committed in a particular county ordinarily is sufficient. (See, e.g., *People v. Berg* (1929) 96 Cal.App. 430, 432 [274 P. 433] [statement that murder was committed "in the County of Los Angeles" sufficient to allege venue].) Even when the crime is committed in part in one county and in part in another, the allegation is sufficient if it asserts the basis for venue in general terms, without alleging specific facts. (See, e.g., *People v. Dieguez* (2001) 89 Cal.App.4th 266, 281 [107 Cal.Rptr.2d 160] [information alleged that crime was committed in part in Contra Costa County and in part in San Francisco County]; *People v. Tolbert* (1986) 176 Cal.App.3d 685, 689 [222 Cal.Rptr. 313] [information sufficiently alleged venue for sexual offenses even though it did not specify in which county they were committed, because sexual offenses were alleged to be connected to a kidnapping, which was alleged to have commenced in San Joaquin County].) Thus the indictment in the present case was sufficient in alleging that "acts preparatory to the commission" of the crimes occurred in San Mateo County and that "property taken in the commission" of the crimes was brought into San Mateo County.

 Furthermore, to the extent defendant contends that the allegations in the indictment were insufficient to afford her a reasonable opportunity to prepare and present a defense, we note that notice is provided not only by the accusatory pleading but also by the transcript of the preliminary hearing or the grand jury proceedings. (*People v. Jones* (1990) 51 Cal.3d 294, 317–318 [270 Cal.Rptr. 611, 792 P.2d 643]; accord, *People v. Diaz* (1992) 3 Cal.4th 495, 557 [11 Cal.Rptr.2d 353, 834 P.2d 1171]; *People v. Marshall* (1957) 48

Cal.2d 394, 399, fn. 5 [309 P.2d 456].) In addition, a "defendant may learn further critical details of the People's case through demurrer to the complaint or pretrial discovery procedures." (*People v. Jones, supra,* 51 Cal.3d at p. 317.) In the present case, defendant was entitled to and did receive a copy of the transcript of the grand jury proceedings. (§ 938.1.) Additionally, in its opposition to defendant's demurrer and motion to set aside the indictment, the People described in detail the specific facts upon which they relied to establish that venue was proper in San Mateo County. Defendant does not contend that these materials were insufficient to afford her adequate notice of the factual basis for the allegation of proper venue in San Mateo County.

Defendant alternatively contends that even if the indictment was sufficient, the evidence presented to the grand jury and at trial was insufficient to establish that venue was proper in San Mateo County. Before trial, the court denied defendant's motion under section 995 to set aside the indictment, finding that the transcript of the grand jury proceedings established that sufficient preparatory acts were committed in San Mateo County because, while in that county, defendant made arrangements for the ride to Palo Alto, took a duffle bag from her San Mateo County home containing items to be used in the Palo Alto burglary—including a gun, a screwdriver, a pair of gloves, and keys—and brought the proceeds of the crime home to San Mateo County. Evidence of these same preparatory acts was presented at trial.

As a preliminary matter, the People urge that defendant, by declining to seek a jury instruction on this issue, forfeited any challenge to the sufficiency of the evidence to support venue. (See *People v. Simon* (2001) 25 Cal.4th 1082, 1110, fn. 18 [108 Cal.Rptr.2d 385, 25 P.3d 598] [the defendant, who did not propose a jury instruction on venue or provide authority to the trial court supporting the giving of such an instruction, could not complain on appeal of the absence of such an instruction].) In the present case, after the jury returned its guilt phase verdicts, the trial court noticed that it had failed to instruct the jury on venue and proposed that jurors be called back to decide that issue.[6] The prosecution contended that defendant already had forfeited her right to a jury determination by failing to request an instruction on venue. Defense counsel indicated that counsel did not wish to submit the issue to the jury at that time, and consequently it was not submitted to the jury.

---

[6] At the time of defendant's trial, case law provided that a defendant had a right to a jury trial on the facts supporting venue. (See, e.g., *People v. Megladdery* (1940) 40 Cal.App.2d 748, 766 [106 P.2d 84].) Subsequently, we concluded that the matter of venue is a question of law for the court, not a question of fact for the jury. (*People v. Posey* (2004) 32 Cal.4th 193, 215 [8 Cal.Rptr.3d 551, 82 P.3d 755].) Nevertheless, because the rule that venue is a question of fact for the jury had been widespread and long standing, we concluded that the new rule should be applied only prospectively. (*Ibid.*)

We need not decide whether defendant forfeited her right to challenge venue because, in any event, the evidence clearly was sufficient to establish venue in San Mateo County. As noted above, when "the acts or effects thereof constituting or requisite to the consummation of the offense occur in two or more jurisdictional territories, the jurisdiction of such offense is in any competent court within either jurisdictional territory." (§ 781.) Pursuant to section 781, an offense may be tried in a county "in which the defendant made preparations for the crime, even though the preparatory acts did not constitute an essential element of the crime." (*People v. Price, supra,* 1 Cal.4th at p. 385 [Humboldt County had jurisdiction over a murder committed in Los Angeles County, because the defendant went to Humboldt County to obtain weapons for the purpose of killing the victim in Los Angeles County].)

The evidence established, and the trial court found, that defendant committed preparatory acts in San Mateo County when she collected the items she planned to use to commit the crimes, including gloves, a screwdriver, a key, and a gun, from her home in San Mateo County, and made arrangements there to be transported to Palo Alto. Defendant suggests these preparatory acts are insufficient because there is no evidence defendant was planning to commit a murder—as opposed to a burglary, theft, or robbery—at the time she made these preparations in San Mateo County. Nevertheless, if preparatory acts occur in one county, those acts vest jurisdiction over the crime "even though the intent may have arisen in another county." (*People v. Bismillah* (1989) 208 Cal.App.3d 80, 86 [256 Cal.Rptr. 25].)

Furthermore, defendant does not assert that the burglary and the robbery were improperly charged in San Mateo County. "When property taken in one jurisdictional territory by burglary . . . [or] robbery . . . has been brought into another, . . . the jurisdiction of the offense is in any competent court within either jurisdictional territory . . . ." (§ 786, subd. (a).) Defendant brought property taken during the Palo Alto (Santa Clara County) burglary and robbery back to her home in San Mateo County. The murder was part of the same transaction as the robbery and burglary, and those offenses were "requisite to the consummation of" the murder. (§ 781.) Force was used against Gleason in furtherance of the robbery, and her murder served to eliminate her as a witness to the robbery and burglary. Consequently, the murder was properly tried in San Mateo County as well.

In this respect, the present case is analogous to *People v. Gutierrez* (2002) 28 Cal.4th 1083, 1116–1119 [124 Cal.Rptr.2d 373, 52 P.3d 572], in which we held that San Bernardino County had jurisdiction to try the defendant for the attempted murder of a police officer that occurred in Riverside County. The defendant in *Gutierrez* kidnapped a woman in San Bernardino County and, while driving through Riverside County, was stopped by a police officer for a

traffic violation. Defendant shot at the officer, and a gun battle ensued. We concluded that San Bernardino County was a proper venue for trial of the attempted murder of the police officer, because the defendant had attempted to kill the officer in order to avoid detection or arrest for the kidnapping, which began in San Bernardino County. Because San Bernardino County had jurisdiction over the kidnapping, it had jurisdiction over the attempted murder as well. (*Id.* at p. 1118.) Similarly, in the present case, San Mateo County had jurisdiction over the robbery and burglary offenses and, because the killing occurred in connection with those crimes, it had jurisdiction to try the murder charge as well.[7]

### F. *Sufficiency of Evidence of Robbery*

Defendant contends that the evidence was insufficient to support her conviction for the robbery of Gleason, because there was no evidence that she had formed the intent to steal from Gleason until after she had shot her. "[W]hen a killer's *only* assaultive conduct occurs *before* forming the intent to steal, a robbery has not occurred, because there is no union of act and larcenous intent." (*People v. Seaton* (2001) 26 Cal.4th 598, 644 [110 Cal.Rptr.2d 441, 28 P.3d 175].) Defendant admitted in her confession, which was in evidence at trial, that she entered the office building with the intent to steal money and money orders from the company located there. Defendant admitted that she was in the process of looking for money when she encountered Gleason, but stated she did not take anything until after the shooting. Defendant stated she was surprised by Gleason in the copy room and shot her because defendant was frightened and nervous. When asked whether she planned to shoot Gleason and then rob her, or vice versa, defendant stated that she had no particular intentions. After the shooting, she took Gleason's keys and $400 that was in an envelope in Gleason's desk. Defendant drove away in Gleason's car, which she later abandoned. Gleason's keys, pager, and purse later were found in defendant's apartment.

On appeal, we uphold the jury's verdict if there was substantial evidence to support it. (*People v. Johnson* (1980) 26 Cal.3d 557, 576–578 [162 Cal.Rptr. 431, 606 P.2d 738].) Considering the entire record, we determine

---

[7] Defendant contends that her conviction and sentencing in a county lacking territorial jurisdiction violated her constitutional rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments of the federal Constitution to a jury trial, to fundamental fairness, to equal protection of the laws, and to reliable guilt and penalty phase determinations. Defendant acknowledges that this court has held that the Sixth Amendment right to be tried in the "district wherein the crime shall have been committed" is not applicable to the states (see *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1059–1069 [108 Cal.Rptr.2d 409, 25 P.3d 618]), but nevertheless raises the issue here in order to preserve her right to pursue it in federal court. Because we have concluded that San Mateo County was a proper venue for trial of the Gleason murder charges, defendant's constitutional claims necessarily must fail.

whether there is evidence that is " 'reasonable in nature, credible, and of solid value' " from which a " 'reasonable trier of fact could have found the prosecution sustained its burden of proving the defendant guilty beyond a reasonable doubt.' " (*Id.* at p. 576.) We have observed that "when one kills another and takes substantial property from the victim, it is ordinarily reasonable to presume the killing was for purposes of robbery." (*People v. Turner* (1990) 50 Cal.3d 668, 688 [268 Cal.Rptr. 706, 789 P.2d 887]; accord, *People v. Bolden* (2002) 29 Cal.4th 515, 553 [127 Cal.Rptr.2d 802, 58 P.3d 931]; *People v. Hughes* (2002) 27 Cal.4th 287, 357 [116 Cal.Rptr.2d 401, 39 P.3d 432]; *People v. Kipp* (2001) 26 Cal.4th 1100, 1128 [113 Cal.Rptr.2d 27, 33 P.3d 450].) "If a person commits a murder, and after doing so takes the victim's wallet, the jury may reasonably infer that the murder was committed for the purpose of obtaining the wallet, because murders are commonly committed to obtain money." (*People v. Marshall* (1997) 15 Cal.4th 1, 35 [61 Cal.Rptr.2d 84, 931 P.2d 262].) The jury was free to disbelieve defendant's statements to the police that she shot Gleason in a panic and that she did not possess any specific intent at that time, especially in view of the circumstance that the prosecution had presented evidence, through its forensic experts, that defendant's version of the circumstances of the shooting was not entirely truthful. Defendant admitted that when she encountered Gleason, she was looking for money to steal and that she was armed with the gun in case she needed to frighten someone. The evidence is sufficient to support the jury's finding that defendant formed the intent to steal before she shot Gleason.

### G. Sufficiency of Evidence of Burglary of ATM's

As charged in counts 9 and 10 of the indictment, defendant was found guilty of second degree burglary of a Bank of America ATM located at 700 Jefferson Avenue in Redwood City. These counts were based upon defendant's attempt to use Carolyn Gleason's ATM card at an ATM located on the outside of the bank building. Defendant contends—and the Attorney General agrees—that her convictions on these two counts must be reversed. Subsequent to defendant's trial, we held that inserting a stolen ATM card into an ATM on the outside of a building does not constitute an "entry" for purposes of the burglary statute. (*People v. Davis* (1998) 18 Cal.4th 712, 718–722 [76 Cal.Rptr.2d 770, 958 P.2d 1083].) Because the evidence did not establish an entry, defendant's convictions on counts 9 and 10 must be reversed.

### H. Instruction on Consciousness of Guilt

Defendant contends the trial court erred in instructing the jury, pursuant to CALJIC No. 2.03, that if "the defendant made a willfully false or deliberately misleading statement concerning the crime for which she is now being tried,

you may consider such statement as a circumstance tending to prove a consciousness of guilt." Over defense counsel's objection that such an instruction was not appropriate because defendant ultimately confessed, the trial court concluded that the instruction should be given because defendant initially made false statements to the police about her involvement in the homicides.

Defendant contends that in *People v. Mattson* (1990) 50 Cal.3d 826 [268 Cal.Rptr. 802, 789 P.2d 983] we "implicitly acknowledged" that CALJIC No. 2.03 should not be given in a case, like the present one, in which the defendant initially denied involvement in the crimes but subsequently confessed. In *Mattson*, we did not conclude the instruction was given in error but commented that under such circumstances, "the probative value of, and inference of consciousness of, guilt from the initial denial was tenuous." (50 Cal.3d at p. 872.) We concluded that the giving of the instruction, even if error, was harmless in light of the overwhelming evidence of guilt, including the defendant's confession.

■ We find no error in the giving of CALJIC No. 2.03 in the present case. The fact that a defendant initially denies involvement and later makes admissions certainly supports a conclusion that the earlier statement was a lie made to avoid detection or culpability. Even when a defendant confesses, his or her state of mind or other details of a crime may remain in dispute. The fact that a defendant initially denied culpability and later made admissions are relevant facts, which must be weighed in light of all the evidence. Although defendant admitted her role in each of the crimes, her counsel continued to dispute her state of mind, urging that she had committed only a theft—not a robbery—of Gleason, and that she had not intended to kill Marks. Additionally, the precise circumstances of the shootings—in particular, whether Esparza and Gleason were on their knees when shot—were in dispute.

Defendant additionally contends that the consciousness-of-guilt instruction undermined the requirement that guilt be found beyond a reasonable doubt and violated her federal constitutional rights to a fair and reliable capital trial by permitting the jury to infer all of the elements of the charged offenses from the circumstance that she initially lied to the police. An instruction that permits the jury to draw an inference of guilt from particular facts is valid only if there is a rational connection between the fact proved and the fact inferred. (*United States v. Gainey* (1965) 380 U.S. 63, 66–67 [13 L.Ed.2d 658, 85 S.Ct. 754]; *Tot v. United States* (1943) 319 U.S. 463, 467–468 [87 L.Ed. 1519, 63 S.Ct. 1241].) In the present case, as defendant admits, the jury reasonably could infer from her false statements that she was conscious of her responsibility for the deaths of Gleason and Esparza, an issue that was not

contested. She asserts, however, that because the instruction did not limit the jury's use of the evidence to this appropriate inference, the instruction permitted the jury to draw other inferences that were not rationally related to the circumstance that defendant had lied, including that (1) defendant was conscious of having committed the crimes with a particular mental state (such as deliberation, premeditation, malice aforethought, or intent to kill), and (2) defendant was conscious of the truth of the factual allegations underlying the robbery and burglary special circumstances.

■■■ Defendant did not request in the trial court that the consciousness-of-guilt instruction be modified or limited in any way, and consequently has forfeited any claim that the instruction should have been modified. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1140 [36 Cal.Rptr.2d 235, 885 P.2d 1].) In any event, it was not misleading as given. "A reasonable juror would understand 'consciousness of guilt' to mean 'consciousness of some wrong-doing' rather than 'consciousness of having committed the specific offense charged.' The instructions advise the jury to determine what significance, if any, should be given to evidence of consciousness of guilt, and caution that such evidence is not sufficient to establish guilt, thereby clearly implying that the evidence is not the equivalent of a confession and is to be evaluated with reason and common sense. The instructions do not address the defendant's mental state at the time of the offense and do not direct or compel the drawing of impermissible inferences in regard thereto." (*People v. Crandell* (1988) 46 Cal.3d 833, 871 [251 Cal.Rptr. 227, 760 P.2d 423].)

I. *Instruction on Firearm-use Enhancements*

Defendant contends that the trial court's instruction on the allegations that defendant personally used a firearm in the commission of certain offenses was erroneous because, in lieu of defining the term "firearm," the court included an instruction that "firearm includes a Smith and Wesson .357 magnum revolver." The evidence showed that the weapon used in this case was a Smith & Wesson .357 magnum revolver. Consequently, defendant contends, the instruction in effect directed a verdict on an issue of fact in violation of her Sixth and Fourteenth Amendment rights to a jury trial and to proof beyond a reasonable doubt under the federal Constitution, and her right to due process of law under the state Constitution. (Cal. Const., art. I, § 15.)

We rejected an analogous argument in *People v. Brown* (1988) 46 Cal.3d 432, 443 [250 Cal.Rptr. 604, 758 P.2d 1135]. In *Brown*, the defendant was charged with murdering a peace officer engaged in the performance of his duties. We held that the trial court did not err in instructing the jury that a Garden Grove police officer and a Garden Grove reserve police officer are peace officers. This instruction "took no element from the jury; it merely

instructed the jury on a point of statutory law—a point not open to dispute—that a Garden Grove police officer is a peace officer. [Citations.] The jury was left to make all essential factual determinations, including whether the victim was a Garden Grove police officer." (*Brown, supra*, 46 Cal.3d at pp. 443–444; cf. *People v. Flood* (1998) 18 Cal.4th 470, 504–507 [76 Cal.Rptr.2d 180, 957 P.2d 869] [the trial court's instruction that certain named individuals are peace officers was harmless error].) Similarly, in the present case, the jury merely was instructed on a point of law that was not open to dispute. The jury was left to decide the factual question of whether defendant used a "Smith and Wesson .357 magnum revolver" in the commission of the crimes. (See *People v. Runnion* (1994) 30 Cal.App.4th 852, 856–858 [36 Cal.Rptr.2d 203] [trial court did not err in instructing the jury that the word "firearm" includes a handgun].) We find no error.

### J. Issues Related to Aggravating Factor of Attempted Escape

As noted above, the prosecution presented evidence, through the out-of-court statements of Cindy Keshmiri, who had been incarcerated with defendant in the county jail and worked on the food line, that defendant had asked Keshmiri for a knife and, after Keshmiri provided her with a hard plastic knife, asked her for aluminum foil. The prosecution theorized that defendant's acts constituted an attempted escape, and thus were admissible in aggravation as "criminal activity . . . which involved . . . the express or implied threat to use force or violence." (§ 190.3, factor (b).) Defendant raises a number of challenges to this evidence and to the court's related instructions regarding it, each of which is discussed below.

#### 1. Absence of instruction that Keshmiri was an accomplice

Defendant argues that, at the penalty phase, the trial court should have instructed the jury that Keshmiri was an accomplice to any attempted escape by defendant and that her out-of-court statements required corroboration. The trial court denied the requested instruction on the ground that the question whether Keshmiri was an accomplice was an issue for the jury. The trial court was correct.

■ An "accomplice" is "one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." (§ 1111.) An accomplice's testimony is not sufficient to support a conviction unless it is corroborated by other evidence connecting the defendant with the commission of the offense. (*Ibid.*) In this context, "testimony" includes an accomplice's out-of-court statements made under questioning by police or under other suspect circumstances. (*People v. Williams* (1997) 16 Cal.4th 153, 245 [66 Cal.Rptr.2d 123,

940 P.2d 710]; *People v. Belton* (1979) 23 Cal.3d 516, 525–526 [153 Cal.Rptr. 195, 591 P.2d 485].) The requirement of accomplice corroboration applies to the penalty phase of a capital trial. (*People v. Williams, supra,* 16 Cal.4th at pp. 244–245.) "Whether a person is an accomplice within the meaning of section 1111 presents a factual question for the jury 'unless the evidence presents only a single inference.' [Citation.] Thus, a court can decide as a matter of law whether a witness is or is not an accomplice only when the facts regarding the witness's criminal culpability are 'clear and undisputed.' [Citations.]" (*People v. Williams, supra,* 16 Cal.4th at p. 679.)

To be an accomplice, Keshmiri would have had to act with knowledge of defendant's criminal purpose and with the intent to encourage or facilitate the commission of the offense. (See *People v. Stankewitz* (1990) 51 Cal.3d 72, 90–91 [270 Cal.Rptr. 817, 793 P.2d 23].) Providing assistance without sharing the perpetrator's purpose and intent is insufficient to establish that a person is an accomplice. (*People v. Sully* (1991) 53 Cal.3d 1195, 1227 [283 Cal.Rptr. 144, 812 P.2d 163].) In her out-of-court statements, Keshmiri admitted providing defendant with a plastic knife but denied any intent to facilitate a crime. Keshmiri told the investigating officer that when she handed defendant the knife, "I didn't realize what I was doing I guess." Subsequently, when defendant commented that the guards did not carry guns, Keshmiri explained, "that's when I took it to seem she meant to escape." "That's why, that's why I freaked out." "I took it as a joke to begin with . . . and then I said . . . that was stupid." That same day, Keshmiri voluntarily reported the incident to the authorities, explaining, "I don't want to see somebody else get hurt over it." If the jurors believed Keshmiri's out-of-court statements, they reasonably could conclude that she did not intend to assist defendant in escaping from custody and therefore was not an accomplice. Consequently, the trial court did not err in permitting the jury to decide whether or not Keshmiri was an accomplice.

### 2. *Absence of instruction for jury to determine whether Keshmiri was an accomplice*

Defendant contends the trial court erred in failing to instruct the jury, in accordance with CALJIC No. 3.19, that it was required to determine whether the witness Keshmiri was an accomplice and that defendant had the burden of proving by a preponderance of the evidence that Keshmiri was an accomplice. (See *People v. Zapien* (1993) 4 Cal.4th 929, 982 [17 Cal.Rptr.2d 122, 846 P.2d 704] [trial court must inform the jury, on its own motion, of the jury's obligation to determine whether a witness is an accomplice].) Defendant contends the trial court's error in failing to direct the jury to determine explicitly whether Keshmiri was an accomplice was compounded by the

court's instructions concerning the testimony of an "in-custody informant," which, she asserts, erroneously informed the jury that Keshmiri was not an accomplice.

The jury was instructed that an in-custody informant is "a person, *other than* a co-defendant, percipient witness, *accomplice,* or co-conspirator," who testifies concerning a statement made by the defendant while both were in custody. (Italics added.) The jury explicitly was instructed that Cindy Keshmiri was an in-custody informant. Following these instructions, defendant contends, the jury assumed that because Keshmiri was an in-custody informant she was not an accomplice and that corroboration of her testimony was not required.

■ We must consider whether it is reasonably likely that the trial court's instructions caused the jury to misapply the law. (*People v. Cain* (1995) 10 Cal.4th 1, 36 [40 Cal.Rptr.2d 481, 892 P.2d 1224]; *People v. Kelly* (1992) 1 Cal.4th 495, 525–527 [3 Cal.Rptr.2d 677, 822 P.2d 385].) "[T]he correctness of jury instructions is to be determined from the entire charge of the court, not from a consideration of parts of an instruction or from a particular instruction." (*People v. Burgener* (1986) 41 Cal.3d 505, 538 [224 Cal.Rptr. 112, 714 P.2d 1251], disapproved on another ground in *People v. Reyes* (1998) 19 Cal.4th 743 [80 Cal.Rptr.2d 734, 968 P.2d 445]; see *Estelle v. McGuire* (1991) 502 U.S. 62, 72 [116 L.Ed.2d 385, 112 S.Ct. 475] [alleged ambiguity in instructions must be viewed in light of the instructions as a whole and the entire record].)

One could construe the instructions to mean that, because Keshmiri was an in-custody informant, and because an in-custody informant is someone "other than . . . [an] accomplice," Keshmiri was not an accomplice. We view it as unlikely, however, that the jury engaged in such an interpretation. Although the trial court did not explicitly tell the jury to decide whether Keshmiri was an accomplice, the instructions given implicitly required such a determination. The jury was instructed that an accomplice's testimony must be corroborated, and the definition of an accomplice was provided. The jury also was given instructions concerning how it was to determine whether an accomplice had been corroborated. Defendant's interpretation would render the instructions on accomplice testimony entirely superfluous.

We conclude it was more likely that the jurors correctly interpreted the instructions, in context, to mean that they were required to apply the instruction regarding in-custody informants only if they concluded that Keshmiri was not an accomplice. Furthermore, both parties in their arguments correctly interpreted these instructions. The prosecutor acknowledged in

closing argument that the defense could argue that Keshmiri was an accomplice and that her statements required corroboration. Defense counsel observed that the instructions concerning accomplice testimony and in-custody informant testimony were given to the jury in the alternative. Defense counsel stated that the jurors could find that Keshmiri was an accomplice; however, "[i]f you were to find that she was not an accomplice but an in-custody informant," the instructions would direct the jurors to be cautious in evaluating her testimony. We find no reasonable likelihood that the jury interpreted the instructions to require that it assume Keshmiri was not an accomplice.

### 3. *Sufficiency of corroboration*

Defendant contends the trial court erred in admitting Keshmiri's statements, because she was an accomplice and there was no corroborating evidence. The trial court agreed that Keshmiri's prior tape-recorded statements were not corroborated. Even if we assume the trial court was correct, that circumstance did not render her statements inadmissible because, as discussed above, the jury reasonably could have concluded that she was not an accomplice. The jury was instructed that "[a] defendant cannot be found to have committed a criminal act based on the testimony of an accomplice unless such testimony is corroborated by other evidence which tends to connect such defendant with the commission of the offense." If the jury determined that Keshmiri was an accomplice, we presume it followed the court's instructions and did not consider the allegation that defendant had committed an attempted escape. On the other hand, if the jury determined—as it could have, under the evidence presented—that Keshmiri was not an accomplice, corroboration was not required.

### 4. *Sufficiency of evidence of attempted escape*

Defendant contends the trial court erred in permitting the jury to hear the tape recordings of Keshmiri's out-of-court statements, because they did not establish "criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence." (§ 190.3, factor (b).) A jury cannot consider evidence of unadjudicated criminal activity as an aggravating factor unless it is convinced beyond a reasonable doubt that the alleged conduct occurred and that it constituted a crime. (*People v. Michaels* (2002) 28 Cal.4th 486, 539 [122 Cal.Rptr.2d 285, 49 P.3d 1032]; *People v. Boyd* (1985) 38 Cal.3d 762, 772–774 [215 Cal.Rptr. 1, 700 P.2d 782].) The prosecution argued that the conduct described by Keshmiri constituted an attempt to escape from county jail, in violation of section 4532, subdivision (b). Defendant contends that, even assuming Keshmiri's statements were true, defendant's conduct amounted to no more than preparation to commit a crime, and not an attempt.

We review the record for "substantial evidence from which a jury could conclude beyond a reasonable doubt that violent criminal activity occurred." (*People v. Tuilaepa* (1992) 4 Cal.4th 569, 587 [15 Cal.Rptr.2d 382, 842 P.2d 1142]; see *People v. Memro* (1985) 38 Cal.3d 658, 698 [214 Cal.Rptr. 832, 700 P.2d 446].) To prove an attempt, " '[s]omething more is required than mere menaces, preparation or planning.' [Citation.]" (*People v. Miller* (1935) 2 Cal.2d 527, 530 [42 P.2d 308].) " '[T]he attempt is the *direct movement* towards the commission after the preparations are made.' " (*Ibid.*) In the present case, Keshmiri's statements were sufficient to support a conclusion that defendant was planning an escape attempt and prepared for that attempt by obtaining a hard plastic knife, but it is questionable whether they were sufficient to establish an actual attempt.

Even if defendant is correct that the evidence was insufficient to establish an attempted escape, however, we conclude that any error in admitting Keshmiri's out-of-court statements was harmless. The weakness of the evidence of an escape attempt, the numerous challenges to Keshmiri's credibility, her refusal to testify at trial, and the instruction requiring the jury to view her testimony with caution diminish the likelihood that the jurors gave significant weight to this evidence. Even if the jurors believed Keshmiri's statements, the incident she described was relatively trivial in comparison to the circumstances of the crimes of which defendant was convicted— defendant murdered two individuals and attempted to murder a third during the course of three separate incidents of burglary and robbery. The prosecutor did argue to the jury that the evidence of an attempted escape demonstrated defendant's willingness to use violence, but did not focus on this evidence as a justification for the death penalty. Indeed, the prosecutor admitted that the evidence of defendant's escape attempt "pales, quite frankly, in comparison to the factors in aggravation under [section 190.3, factor] (a), but it happened. We brought it to your attention and you can consider it and give it whatever weight you deem appropriate." Defendant contends that this evidence was harmful because it may have influenced the jury to conclude that defendant was an escape risk and that the public could not be protected from her if they sentenced her to life imprisonment. The weakness of defendant's plan and the absence of any evidence that defendant actually attempted to carry out that plan, however, render it unlikely that the jury considered her to be a serious escape risk. We find no reasonable possibility that this evidence influenced the jury's decision to impose the death penalty.

5. *The trial court's refusal to excise portions of Keshmiri's statements*

Defendant contends that the trial court erred in refusing to excise certain statements from the tape recording of Keshmiri's interview with law enforcement authorities, and that these statements were sufficiently inflammatory that

they rendered defendant's trial fundamentally unfair, in violation of her rights to due process of law and to a reliable penalty determination. (U.S. Const., 8th & 14th Amends.) After the trial court ruled that Keshmiri's out-of-court statements could be admitted as prior inconsistent statements under Evidence Code sections 1235 and 770, defense counsel objected to two portions of the statements: Keshmiri's comments that (1) she regularly teased defendant about why defendant was in custody, (2) she would "bullshit" with defendant about her killing people and would "say duck when she goes by." Defense counsel argued that these statements were irrelevant and extremely prejudicial, because they suggested that defendant was willing to participate in humor about committing homicide. The trial court overruled defendant's objections, concluding that the statements were relevant to show Keshmiri's relationship with defendant.

Defendant argues that the prejudicial effect of these comments outweighed their probative value. Although Keshmiri's comments about joking with defendant revealed something about Keshmiri's own character, defendant contends they also "implied that [defendant] shared some morbid sense of jocularity regarding the very serious charges she was facing." On the other hand, defendant argues, these comments were not necessary to establish defendant's relationship with Keshmiri, because that relationship was fully established by other, less prejudicial portions of Keshmiri's interview with the officers.[8]

We review the trial court's ruling for abuse of discretion, which is established by "a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice [citation]." (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9–10 [82 Cal.Rptr.2d 413, 971 P.2d 618].)

We find no abuse of discretion. When called to testify, Keshmiri denied knowing defendant and claimed that the Celeste Carrington she knew was an entirely different person. Keshmiri's out-of-court statement that she teased defendant regarding the killings helped to establish that the person she spoke about to the officers was indeed defendant, who had been charged with murder. Furthermore, Keshmiri's accepting attitude toward defendant and her

---

[8] Keshmiri told Deputy McKague that "we got along real good. I think she kind of liked me, as a matter of fact. . . . [W]hen [my] niece was up in [the same dormitory unit as defendant] after I left I asked her to watch out for my niece. So we got a fairly good rapport going." Keshmiri explained that defendant chose to approach her because "we had kind of a connection going." In her interview with the district attorney inspector, Bruce Sabin, Keshmiri stated that she and defendant had many friendly conversations, that Keshmiri was one of the few individuals with whom defendant spoke, that they had meals together, and that they had established a rapport.

crimes lent credibility to her statement that defendant approached her for assistance. The trial court's ruling was reasonable and did not deny defendant a fair trial.

### K. Admission of Victim Impact Evidence

Defendant filed a motion in the trial court to limit the scope of victim impact evidence that the prosecutor would be permitted to present at trial, and requested an offer of proof as to evidence that the prosecutor intended to introduce. The trial court conducted a hearing, at which the prosecutor discussed the witnesses she planned to call to testify. At that hearing, defendant argued that Evidence Code section 352 should apply, that the number of witnesses should be limited to avoid undue prejudice, and that generally those witnesses who had closer relationships and more recent contact with the victims were most relevant. The trial court declined to limit the number of victim impact witnesses whom the prosecution could present.

Defendant now argues that specific limitations should be placed on victim impact evidence. First, she contends that, absent unusual circumstances, such evidence should be limited to the testimony of a single witness. (See *State v. Muhammad* (1996) 145 N.J. 23 [678 A.2d 164, 180] [imposing such a limitation, based upon the court's conclusion that "[t]he greater the number of survivors who are permitted to present victim impact evidence, the greater the potential . . . to unduly prejudice the jury against the defendant"].) Second, defendant contends that victim impact evidence is relevant and admissible as a "circumstance[] of the crime" (§ 190.3, factor (a)) only if it involves either (1) the effect of the murder on a family member who was present at the scene during or immediately after the crime, or (2) consequences of the crime that were known or reasonably apparent to the defendant at the time she committed the crime. Under this standard, defendant contends that most of the victim impact evidence admitted in this case should have been excluded because none of the witnesses who testified were present at the scene or immediately after the crime, and the testimony included information regarding the character of the victims—information that was unknown to defendant. Additionally, defendant contends that an interpretation of "circumstances of the crime" so broad as to include the victim impact evidence admitted in this case would render that aggravating factor unconstitutionally overbroad and vague. (U.S. Const., 8th & 14th Amends.; Cal. Const., art. I, §§ 7, 15 & 17.)

We previously have rejected arguments that victim impact evidence must be confined to what is provided by a single witness (*People v. Zamudio* (2008) 43 Cal.4th 327, 364 [75 Cal.Rptr.3d 289, 181 P.3d 105]), that victim impact witnesses must have witnessed the crime (*People v. Brown* (2004) 33 Cal.4th 382, 398 [15 Cal.Rptr.3d 624, 93 P.3d 244]), and that such

evidence is limited to matters within the defendant's knowledge (*People v. Pollock* (2004) 32 Cal.4th 1153, 1183 [13 Cal.Rptr.3d 34, 89 P.3d 353]). We also have concluded that construing section 190.3, factor (a) to include victim impact evidence does not render the statute unconstitutionally vague or overbroad. (*People v. Pollock, supra,* 32 Cal.4th at p. 1183.) Defendant provides no compelling argument for this court to reconsider these decisions.

Defendant additionally contends that the trial court erred in admitting testimony suggesting that Gleason's death caused her mother to die prematurely and her father to suffer a stroke. Prior to the commencement of the penalty phase, the trial court agreed that evidence of the death of Gleason's mother and the illness of her father could be admitted in order to explain why they were not called to testify. In response to defendant's concern that the jury might infer that the death and the illness resulted from the murder of Gleason, the prosecutor agreed that such an inference would not be appropriate and that she would not make this argument to the jury.

During the penalty phase, Michael Gleason testified that Caroline Gleason's father recently had had a stroke, that her mother had died earlier in the year, and that her mother-in-law had died the previous year. In reference to Gleason's mother's death, the witness added, "I think the loss of her daughter took its toll." The court promptly admonished the witness on its own motion, stating that "this is an area we can't speculate about."

 We find no error in the court's admission of evidence regarding the status of Gleason's parents. It is well established that a party may comment on the opposing party's failure to call anticipated witnesses. (*People v. Stevens* (2007) 41 Cal.4th 182, 210 [59 Cal.Rptr.3d 196, 158 P.3d 763], citing *People v. Chatman* (2006) 38 Cal.4th 344, 403 [42 Cal.Rptr.3d 621, 133 P.3d 534]; *People v. Lewis* (2001) 25 Cal.4th 610, 670 [106 Cal.Rptr.2d 629, 22 P.3d 392]; *People v. Szeto* (1981) 29 Cal.3d 20, 34 [171 Cal.Rptr. 652, 623 P.2d 213]; *People v. Vargas* (1973) 9 Cal.3d 470, 475 [108 Cal.Rptr. 15, 509 P.2d 959]; see *People v. Bolden, supra,* 29 Cal.4th at pp. 552–553.) The court allowed the prosecution to introduce evidence intended to dispel any potential negative implication that might be drawn by the jury or by defense counsel based upon the prosecution's failure to call Gleason's parents as witnesses.

When the witness went further and commented on the possible effect of the victim's death on her mother's health, the court properly informed him—in the presence of the jury—that such speculation was inappropriate. To the extent defendant contends the trial court should have admonished the jury to ignore or limit its consideration of this evidence, her claim has been forfeited by her failure to request an admonition in the trial court. (See *People v. Ochoa* (1998) 19 Cal.4th 353, 427–428 [79 Cal.Rptr.2d 408, 966 P.2d 442].)

### L. *Absence of Limiting Instruction on Victim Impact Evidence*

Defendant contends that the trial court erred in failing to instruct the jury, on its own motion, concerning the proper use of victim impact evidence. Although defendant did not request any such instruction in the trial court, she suggests that the following instruction (one proposed, although not mandated, by the Supreme Court of Pennsylvania in *Commonwealth v. Means* (2001) 565 Pa. 309 [773 A.2d 143, 159]) would have been appropriate: "Victim impact evidence is simply another method of informing you about the nature and circumstances of the crime in question. You may consider this evidence in determining an appropriate punishment. However, the law does not deem the life of one victim more valuable than another; rather, victim impact evidence shows that the victim, like the defendant, is a unique individual. Your consideration must be limited to a rational inquiry into the culpability of the defendant, not an emotional response to the evidence." Defendant contends that in the absence of such an instruction, "there was nothing to stop raw emotion and other improper considerations from tainting the jury's decision," in violation of her right to a decision by a rational and properly instructed jury, the due process right to a fair trial, and the right to a fair and reliable capital penalty determination. (U.S. Const., 6th, 8th, & 14th Amends.; Cal. Const., art. I, §§ 7, 15, 16 & 17.)

We previously have rejected these same contentions. In *People v. Zamudio, supra,* 43 Cal.4th at pages 369–370, we found unpersuasive an argument that the trial court has a duty to give such an instruction on its own motion. We concluded that (1) the first two sentences of defendant's proposed instruction were covered adequately by CALJIC No. 8.85, which also was read to the jury in the present case; (2) defendant's proposed instruction is incorrect to the extent it suggests that a juror's emotional response to the evidence may play no part in his or her decision; and (3) an instruction "informing the jurors that the law does not deem the life of one victim more valuable than another" is "not necessary to the jury's understanding of [the] case." (*People v. Zamudio, supra,* 43 Cal.4th at p. 370.)

### M. *Challenges to California's Capital Sentencing Scheme*

Defendant advances a number of constitutional challenges to the California death penalty law and to instructions given to the jury based upon that law—challenges that, she concedes, we previously have rejected. Defendant provides no convincing reason for us to reconsider our previous holdings on these issues. Consequently, we reject defendant's argument that her death sentence violates articles 6 and 7 of the International Covenant on Civil and Political Rights, which prohibit cruel, inhuman, or degrading punishment and the arbitrary deprivation of life. "International law does not compel the

elimination of capital punishment in California." (*People v. Snow* (2003) 30 Cal.4th 43, 127 [132 Cal.Rptr.2d 271, 65 P.3d 749].)

We also have rejected the argument, presently made by defendant, that the assertedly regular imposition of the death penalty as punishment for a substantial number of homicides—as opposed to exceptional crimes such as treason—constitutes cruel and unusual punishment because such punishment has been abolished in the majority of nations, including all of Western Europe. "California's status as being in the minority of jurisdictions world-wide that impose capital punishment, especially in contrast with the nations of Western Europe, does not violate the Eighth Amendment. (See, e.g., *People v. Moon* (2005) 37 Cal.4th 1, 47–48 [32 Cal.Rptr.3d 894, 117 P.3d 591].)" (*People v. Mungia* (2008) 44 Cal.4th 1101, 1143 [81 Cal.Rptr.3d 614, 189 P.3d 880].) California does *not* impose capital punishment as a " 'regular punishment for substantial numbers of crimes.' " (*People v. Demetrulias* (2006) 39 Cal.4th 1, 43 [45 Cal.Rptr.3d 407, 137 P.3d 229], italics omitted.) "The death penalty is available only for the crime of first degree murder, and only when a special circumstance is found true; furthermore, administration of the penalty is governed by constitutional and statutory provisions different from those applying to 'regular punishment' for felonies. (E.g., Cal. Const., art. VI, § 11; §§ 190.1–190.9, 1239, subd. (b).)" (*Id.* at p. 44.)

"This court's refusal to conduct intercase proportionality review of a death sentence does not violate the federal Constitution. [Citation.]" (*People v. Wallace* (2008) 44 Cal.4th 1032, 1098 [81 Cal.Rptr.3d 651, 189 P.3d 911].) Furthermore, because "capital defendants are not similarly situated to non-capital defendants, the death penalty law does not violate equal protection by denying capital defendants certain procedural rights given to noncapital defendants. [Citations.]" (*People v. Cruz* (2008) 44 Cal.4th 636, 681 [80 Cal.Rptr.3d 126, 187 P.3d 970].)

We previously have rejected defendant's challenges to the penalty phase jury instruction given in this case, CALJIC No. 8.88. The jury need not be told explicitly that it must return a verdict of life imprisonment without the possibility of parole if the mitigating circumstances outweigh the aggravating circumstances. (*People v. Duncan* (1991) 53 Cal.3d 955, 978 [281 Cal.Rptr. 273, 810 P.2d 131].) The instruction that jurors may impose a death sentence only if the aggravating factors are " 'so substantial' " in comparison to the mitigating circumstances that death is warranted does not create an unconstitutionally vague standard. (*People v. Catlin* (2001) 26 Cal.4th 81, 174 [109 Cal.Rptr.2d 31, 26 P.3d 357]; *People v. Mendoza* (2000) 24 Cal.4th 130, 190 [99 Cal.Rptr.2d 485, 6 P.3d 150].) There is no requirement in the federal or the state Constitution that the jury reach a unanimous agreement with respect to the factors in aggravation, that jurors find the factors in aggravation to be

true beyond a reasonable doubt, that the jury find beyond a reasonable doubt that the circumstances in aggravation outweigh those in mitigation before imposing the death penalty, or that the jury find beyond a reasonable doubt that death is the appropriate punishment. (*People v. Wallace, supra,* 44 Cal.4th at p. 1097.) "We have repeatedly held that the high court's recent decisions [in *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348]; *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428]; and *Blakely v. Washington* (2004) 542 U.S. 296 [159 L.Ed.2d 403, 124 S.Ct. 2531]] do not compel a different answer. [Citations.]" (*People v. Mendoza* (2007) 42 Cal.4th 686, 707 [68 Cal.Rptr.3d 274, 171 P.3d 2]; see also *People v. Page* (2008) 44 Cal.4th 1, 60 [79 Cal.Rptr.3d 4, 186 P.3d 395]; *People v. Lewis* (2008) 43 Cal.4th 415, 421 [75 Cal.Rptr.3d 588, 181 P.3d 947].) "It is settled . . . that California's death penalty law is not unconstitutional in failing to impose a burden of proof—whether beyond a reasonable doubt or by a preponderance of the evidence—as to the existence of aggravating . . . and mitigating circumstances, or the appropriateness of a sentence of death. [Citations.]" (*People v. Alfaro* (2007) 41 Cal.4th 1277, 1331 [63 Cal.Rptr.3d 433, 163 P.3d 118].)

"Section 190.3, factor (a), which allows the jury to consider '[t]he circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true pursuant to Section 190.1,' does not violate the Fifth, Sixth, Eighth, or Fourteenth Amendment to the United States Constitution by allowing arbitrary imposition of the death penalty. (*Tuilaepa v. California* (1994) 512 U.S. 967, 975–976 [129 L.Ed.2d 750, 114 S.Ct. 2630]; *People v. Stevens, supra,* 41 Cal.4th at p. 211.)" (*People v. Loker* (2008) 44 Cal.4th 691, 755 [80 Cal.Rptr.3d 630, 188 P.3d 580]; see also *People v. Williams* (2008) 43 Cal.4th 584, 648 [75 Cal.Rptr.3d 691, 181 P.3d 1035]; *People v. Alfaro, supra,* 41 Cal.4th at p. 1330.) "As the United States Supreme Court noted in upholding factor (a) against an Eighth Amendment challenge, 'our capital jurisprudence has established that the sentencer should consider the circumstances of the crime in deciding whether to impose the death penalty. [Citation.]' " (*People v. Page, supra,* 44 Cal.4th at p. 60.) Nor is section 190.3, factor (a) applied in an unconstitutionally arbitrary or capricious manner merely because prosecutors in different cases may argue that seemingly disparate circumstances, or circumstances present in almost any murder, are aggravating under factor (a). (*People v. Brown, supra,* 33 Cal.4th at p. 401.) Rather, "each case is judged on its facts, each defendant on the particulars of his [or her] offense." (*Ibid.*)

### N. *Motion to Modify the Verdict*

The trial court considered and rejected defendant's motion, pursuant to section 190.4, subdivision (e), to modify the death verdict to life imprisonment without the possibility of parole. Defendant urges that the trial court erred in two respects in denying the motion.

First, defendant contends that the court failed to apply the proper legal standard. In ruling upon a motion under section 190.4, subdivision (e), "the trial court must independently reweigh the evidence of aggravating and mitigating factors presented at trial and determine whether, in its independent judgment, the evidence supports the death verdict." (*People v. Steele* (2002) 27 Cal.4th 1230, 1267 [120 Cal.Rptr.2d 432, 47 P.3d 225].) In support of her claim that the court applied an incorrect standard, defendant points to the circumstance that, in announcing its ruling, the court stated that it needed to "make a determination as to whether the jury's finding and verdict that the aggravating circumstances are contrary to law or that the evidence was presented was not correct." Defendant notes that this statement is difficult to interpret, but she suggests the court believed—incorrectly—that the jury's verdict could be set aside only if based upon "incorrect evidence."

It appears the court misspoke, but we consider it reasonably likely that the court was observing that the question before it was whether the jury's verdict was "contrary to law or to the evidence presented," the standard stated in section 190.4, subdivision (e). The court's ruling, when considered in its entirety, indicates that it exercised its *independent* judgment and did not limit its determination to whether the jury's verdict was based upon "incorrect" evidence. At the outset, the court stated that it must "make an independent determination" whether the imposition of the death penalty was proper, and that it must "weigh the evidence and evaluate the credibility of the witnesses and determine the probative value of the evidence, which is what I have done." The court concluded that the jury's findings were supported by "the overwhelming weight of the evidence and [are] not contrary to law." The court thoroughly reviewed the evidence introduced at both the guilt and penalty phases, and set forth its "independent judgment as to the truth and the weight" of each of the aggravating and mitigating factors. The court stated that it "agrees with the jury" after making its own "personal assessment of the evidence." The record demonstrates that "the court carefully and conscientiously performed its duty under section 190.4." (*People v. Steele, supra*, 27 Cal.4th at p. 1268.)

Second, defendant contends the trial court also misconstrued section 190.3, factor (i), in stating that defendant's age constituted an aggravating factor. Defendant notes we have observed that chronological age itself is

neither aggravating nor mitigating, but the word "age" as used in factor (i) is "a metonym for any age-related matter suggested by the evidence or by common experience or morality that might reasonably inform the choice of penalty." (*People v. Lucky* (1988) 45 Cal.3d 259, 302 [247 Cal.Rptr. 1, 753 P.2d 1052].) Contrary to defendant's assertion, the trial court's finding that age was an aggravating factor in the present case is consistent with our interpretation of section 190.3, factor (i). The court explained: "The defendant was approximately 30 years of age and old enough to appreciate the wrongfulness of her conduct." The circumstance that defendant's age rendered her capable of appreciating the wrongfulness of her conduct "is a permissible age-related inference." (*People v. Mendoza, supra*, 24 Cal.4th at p. 190; see also *People v. Slaughter* (2002) 27 Cal.4th 1187, 1224 [120 Cal.Rptr.2d 477, 47 P.3d 262] [the jury properly could consider the prosecutor's argument that the defendant was " 'old enough to know better' "].)

### III. CONCLUSION

For the reasons stated above, defendant's convictions on counts 9 and 10 are reversed and the judgment and sentence are otherwise affirmed.

Kennard, J., Baxter, J., Werdegar, J., Chin, J., Moreno, J., and Corrigan, J., concurred.

Appellant's petition for a rehearing was denied September 17, 2009.