Filed 9/9/24  P. v. Betancourt CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>LEONEL BETANCOURT,<br><br>    Defendant and Appellant. | H050961<br>(Santa Clara County<br>Super. Ct. No. C2203231) |

Defendant Leonel Betancourt was convicted by jury of six counts of sexual intercourse or sodomy with a child 10 years old or younger (Pen. Code, § 288.7, subd. (a); counts 1, 2, 6, 7, 14, 15; unspecified statutory references are to the Penal Code); six counts of oral copulation or sexual penetration with a child 10 years old or younger (§ 288.7, subd. (b); counts 3–5, 11–13); four counts of lewd acts on a child under 14 years old (§ 288, subd. (a); counts 8–10, 28); six counts of lewd acts on a child under 14 years old by force, fear, or duress (§ 288, subd. (b)(1); counts 16, 22–26); two counts of aggravated sexual assault of a child by oral copulation (§ 269, subd. (a)(4); counts 17, 18); two counts of aggravated sexual assault of a child by sexual penetration (§ 269, subd. (a)(5); counts 19, 20); aggravated sexual assault of a child by sodomy (§ 269, subd. (a)(3); count 21); and two counts of coercing a minor to pose for photographs of a sexual nature (§ 311.4, subd. (c); counts 27, 29).  On appeal, he contends the judgment must be reversed in its entirety due to prosecutorial misconduct in closing argument, and based on faulty instructions regarding the jury's consideration of Child Sexual Abuse

Accommodation Syndrome (CSAAS) evidence. For the reasons explained here, we will affirm the judgment.

## I.     TRIAL COURT PROCEEDINGS

### A.  FRESH COMPLAINT EVIDENCE

Linda Doe's daughters, E. Doe and A. Doe, moved in with their aunt Luisa after their house burned down in June 2021. Defendant, who had two sons with Luisa, also lived with them. A. Doe moved back in with Linda in July 2021, and E. Doe moved back in with her in November 2021. In February 2022, Linda heard something from Luisa about defendant and A. Doe. Later that day, Linda asked E. Doe and A. Doe whether defendant had ever touched them. E. Doe said that he had. Linda contacted police in March 2022.

Jessica Doe, Luisa's sister and the mother of H. Doe and J. Doe, knew defendant as Luisa's "ex-partner." H. Doe and J. Doe often spent time with Luisa and defendant, and spent the night with them on two occasions. In February 2022, H. Doe and J. Doe told Jessica something about defendant that led Jessica to contact police.

### B.  VICTIM TESTIMONY

H. Doe was 11 years old at the time of trial in November 2022. She testified that when she was nine years old, defendant put his penis inside her anus at her grandmother's house. Another time at her grandmother's house, defendant put his penis inside her vagina. Defendant once put his penis inside her anus and vagina at an apartment he shared with Luisa. Another time at the apartment, defendant put his penis inside her anus; she wanted to kick him and run away. In total, defendant put his penis inside her anus nine or 10 times. He also made her put her mouth on his penis five or six times. When she was eight years old, defendant once put something on his penis that smelled like strawberries and made her lick it off. She told her aunt Luisa what had happened, and her aunt said she would "handle" defendant. Luisa also once saw defendant take H. Doe into a bedroom, close the door, and take his pants off. Another time, defendant

2

pushed her head back and forth while his penis was in her mouth. Defendant then licked her vagina. He put his mouth on her vagina seven or eight other times, and he also put his finger inside her vagina seven or eight times. One of those times, defendant touched her vagina with his fingers and photographed it with his phone.

J. Doe was 10 years old at the time of trial. She testified that defendant once followed her into a bedroom and closed the door. He removed both of their pants, licked his fingers, and touched her vagina and labia. Sometime later, in the living room at her grandmother's house, defendant again removed her pants, licked his fingers, and put them inside her vagina. On another occasion at her grandmother's house, defendant again followed her into a bedroom and closed the door. He removed both of their pants and underwear, put her on the bed, inserted his penis between her labia, and moved it back and forth using his hand. She felt pain in her vagina. Defendant also put his penis inside her anus between five and 10 times and put his fingers inside her anus once or twice. Once, he opened her legs and put his mouth on her vagina. He squeezed her chest twice, and once made her touch his penis with her hand.

E. Doe was 14 years old at the time of trial. A few times while she was in middle school, defendant put his penis in her mouth and moved her head up and down. She once bit down on his penis to make him stop. Defendant would also sometimes make her touch his penis and rub it up and down. When she was younger, defendant touched her vagina with his hand, then took out his penis and got on top of her. She initially could not remember what happened next, then testified after reviewing her previous statements to police that defendant had pushed and prodded her vagina and anus with his penis while he held her in place. Another time, defendant again tried to penetrate her vagina and anus with his penis. Defendant once picked her up from the bathtub while she was taking a bath, set her on the bathroom sink, and touched her chest and vagina while his penis was exposed. Once or twice, while her cousins were also in the room, defendant touched her thighs and vagina and put his hand under her shirt to touch her chest. She once woke up

3

in bed to find defendant touching her chest and vagina. Defendant would also kiss her cheeks, hands, lips, and chest. Approximately four times, defendant took photographs of her naked body and vagina with his phone while "opening the holes." She had tried to forget what defendant did to her, so she did not remember some of the incidents well at the time of trial.

A. Doe was 13 years old at the time of trial. When she was 11 years old and living with Luisa and defendant, she woke up one day to find defendant putting his hand under her shirt. Defendant was rubbing the area between her ribs and chest; she moved away and defendant left the room.

## C. FORENSIC EVIDENCE

Police searched two cell phones belonging to defendant. They obtained a "full extraction" from one phone and a "partial extraction" from the other. No pornographic images of the victims were found.

A physician assistant examined J. Doe, H. Doe, E. Doe, and A. Doe in February and March of 2022. She did not find any injuries indicating sexual penetration. She testified that injuries would not likely be observable after four months, and the lack of observable injuries did not mean that no penetration occurred.

## D. CSAAS EVIDENCE AND INSTRUCTION

Dr. Anthony Urquiza testified as an expert in Child Sexual Abuse Accommodation Syndrome. He was not aware of the facts of the case and had not spoken to any of the witnesses.

According to Urquiza, CSAAS is not a diagnosis but rather a pattern of behaviors that commonly occur in cases of child sexual abuse and which are contrary to common misconceptions about how children respond to abuse. CSAAS has five components: secrecy, helplessness, entrapment, delayed or unconvincing disclosure, and retraction. Children who are sexually abused may keep the abuse a secret, feel helpless to resist the abuse, feel trapped in the abuse, disclose the abuse in stages or after a long period of time

4

has passed, have difficulty remembering details of the abuse, or retract their allegations of abuse. All five components are not always present.

The trial court instructed the jury using CALCRIM No. 1193: "You have heard testimony from an expert regarding child sexual abuse accommodation syndrome. [¶] Child sexual abuse accommodation syndrome relates to a pattern of behavior that may be present in child sexual abuse cases. Testimony as to the accommodation syndrome is offered only to explain certain behavior of an alleged victim of child sexual abuse. [¶] An expert's testimony about child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the crimes charged against him or any conduct or crimes with which he was not charged. [¶] You may consider this evidence only in deciding whether or not an alleged victim's conduct was consistent with the conduct of someone who has been molested, and in evaluating the believability of her testimony."

## E. DEFENSE CASE

Defendant testified that he had dated Luisa for 13 years and they raised two sons together. They lived together in a house with Luisa's extended family—including E. Doe, H. Doe, and J. Doe at certain points—then later at an apartment with E. Doe and A. Doe.

Defendant denied ever being alone with any of the girls or touching any of them inappropriately. He recalled once going into a room where A. Doe was sleeping to look for a remote control, and waking her up by touching her on the shoulder. Defendant acknowledged owning strawberry lubricant but said he used it only with Luisa.

Luisa and defendant stopped living together in November 2021. In February 2022, Luisa learned defendant had cheated on her with another woman for two years during their relationship. The affair made Luisa very angry. When asked whether he thought anyone might benefit from his being convicted, defendant answered, "Probably, yes. [¶] … [¶] I just think for the affair that I had."

5

## F. CLOSING ARGUMENTS AND MISTRIAL MOTION

Defense counsel argued the prosecution had not proven defendant's guilt beyond a reasonable doubt, in part based on the prosecution not calling Luisa as a witness. In rebuttal, the prosecutor argued: "But when the defendant comes up and chooses to testify, when the Defense comes forward and tells you, 'Wouldn't you have loved to hear from these other people?' they have the exact same subpoena power as I do. Those arguments apply to them – neither side. [¶] So if you're saying, 'Where is Luisa?' Why didn't we bring in the mother of his two teenaged children, the woman who has been with him for 14 years, and from our understanding – from finding out at trial – protected him to a certain extent, by not going to the police when [H. Doe] came forward?" The trial court sustained a defense objection and asked the prosecutor to "rephrase."

The prosecutor continued: "As to what [H. Doe] explained, right, I am not asking you in any way, period, to speculate as to what any witness or potential witness that did not come in would have testified to, right? That goes completely against what I've made very clear. [¶] You can only rely on the evidence, right? Only rely on your common sense and only rely on the law, right? [¶] We were able to hear from the four girls. They were able to explain their own experiences. As I said, the Defense has the same type of power. If they're making suggestions as to what you should speculate to, that should always be disregarded, from either side."

Defendant moved for a mistrial based on prosecutorial misconduct. Counsel argued the prosecutor improperly suggested defendant could have called Luisa as a witness, despite knowing she would have exercised her Fifth Amendment privilege against self-incrimination. He also argued the prosecutor implied the existence of facts not in evidence relating to Luisa's knowledge of the abuse, failure to report the abuse, and protection of defendant. The prosecutor countered that her rebuttal was a fair response to defense counsel's commentary and was supported by the evidence.

6

The trial court denied defendant's mistrial motion. It found the prosecutor's suggestion that defendant was equally able to call Luisa as a witness "problematic"— albeit not misconduct and not prejudicial to defendant—because defendant, unlike the prosecution, lacked the power to grant Luisa immunity. As for the statement that Luisa protected defendant by not reporting the abuse to police, the court found that although it may have been reasonable to infer as much from H. Doe's testimony, the assertion was not fully supported by the evidence and as a result may have been confusing to the jury. But the court found no intentional misstatement of the evidence. It also found no prejudice from any inadvertently confusing statement, because a defense objection was sustained and the prosecutor then moved on to a different topic.

After deliberations began, the jury was returned to the courtroom to receive a curative instruction from the court which stated: "unlike the People, the Defense may not have been able to call Luisa [Doe] as a witness. So the jury is not to consider whether the Defense could have called her as a witness, or why the Defense did not call her as a witness. That evidence is not before the Court."

## G. VERDICT AND SENTENCING

The jury found defendant guilty on all 29 counts. The parties waived jury trial on the allegations that certain offenses were committed against multiple victims (§667.61, subd. (j)(2)) and all of the offenses were committed against victims who were particularly vulnerable (§1170, subd. (b)). The trial court found the allegations true. The court sentenced defendant to fully consecutive terms of 25 years to life on counts 1, 2, 6–10, 14–16, 22–26, and 28; and 15 years to life on counts 3–5, 11–13, and 17–21 (totaling 565 years to life), consecutive to 24 months on counts 27 and 29.

## II. DISCUSSION

Defendant argues the prosecutor's rebuttal comments about Luisa and the defense subpoena power constituted prejudicial misconduct. He also takes issue with the trial court's use of CALCRIM No. 1193 to instruct the jury on CSAAS, and contends the

7

errors were cumulatively prejudicial.  We see no prejudicial misconduct or instructional error.

## A. PROSECUTORIAL MISCONDUCT

Defendant asserts prosecutorial misconduct on the same grounds considered and rejected by the trial court.  We agree with the trial court that the prosecutor did not commit misconduct in discussing the evidence that Luisa knew of the abuse, and we would find no prejudice in any event given that a defense objection was sustained.  Even assuming the prosecutor improperly rebutted defense counsel's argument regarding Luisa's absence as a witness, the sustained objection and the court's curative instruction averted any prejudice to defendant.

In his closing argument, defense counsel suggested the prosecution's failure to call Luisa as a witness created reasonable doubt.  The prosecutor responded in rebuttal by arguing the defense had the "exact same subpoena power" as the prosecution and alluding to evidence that Luisa "protected [defendant] … by not going to the police when [H. Doe] came forward" while the abuse was still ongoing.  After a defense objection was sustained, the prosecutor clarified that she was not asking the jury "to speculate as to what any witness or potential witness that did not come in would have testified to" and reiterated that "the Defense has the same type of power" to subpoena witnesses as the prosecution does.  "If they're making suggestions as to what you should speculate to," she continued, "that should always be disregarded, from either side."

Viewed in context, the prosecutor's reference to the defense subpoena power was largely a fair response to defense counsel's argument.  (See *United States v. Williams* (9th Cir. 1993) 990 F.2d 507, 509–510.)  The prosecutor's suggestion that both parties had the "exact same subpoena power" may have been inaccurate given that only the prosecution had the power to grant Luisa immunity if she "was going to take the Fifth".  But a sustained defense objection made it unlikely that the jury would "construe[] the remarks in an objectionable fashion." (*People v. Duff* (2014) 58 Cal.4th 527, 568.)  After

8

being asked to "rephrase" her argument, the prosecutor stated that both parties had "the same type of power" to subpoena witnesses. That description was more accurate, and prompted no objection from defense counsel. The prosecutor's statements therefore did not "infect the trial 'with such unfairness as to make the conviction a denial of due process' or involve 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' " (*People v. Cole* (2004) 33 Cal.4th 1158, 1204 (*Cole*).)

We reject defendant's comparison of this case to *People v. Roberts* (2021) 65 Cal.App.5th 469, where the prosecutor argued the victim may have gone to the hospital despite *knowing* the victim had not done so. (*Id.* at p. 481.) Defendant did not attempt to call Luisa as a witness, Luisa did not formally invoke her Fifth Amendment privilege against self-incrimination, and the prosecutor represented to the trial court that Luisa could have been granted immunity to testify as a defense witness. And in any event, the trial court's curative instruction made clear that defendant may not have been able to call Luisa as a witness and that the jury should not consider why he did not do so or what she might have said. We presume the jury followed the court's instructions. (See *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 83.)

The prosecutor's statements about Luisa's knowledge of the abuse also did not rise to the level of prejudicial misconduct. As the trial court noted, there was evidence that Luisa knew of the abuse months or years before the police investigation commenced in February 2022. Although there was no evidence directly establishing that Luisa failed to report the abuse to police or that she protected defendant, those facts could reasonably be inferred from H. Doe's testimony. Defendant suggests the trial court found no evidentiary support at all for the prosecutor's argument, pointing to the court's statement that the argument was not supported by "even [] circumstantial evidence." But the court also stated, the argument that Luisa "protected him to a certain extent by not going to the police, that's a reasonable inference."

9

Prosecutors " 'have wide latitude to discuss and draw inferences from the evidence at trial,' and whether 'the inferences the prosecutor draws are reasonable is for the jury to decide.' " (*Cole*, *supra*, 33 Cal.4th at p. 1203, quoting *People v. Dennis* (1998) 17 Cal.4th 468, 522.) Nonetheless, the court did sustain the defense objection and described the argument as "confusing" because Luisa did not testify and "nobody talked about any of this." The prosecutor then clarified to the jurors that she was not asking them to speculate about what Luisa might have testified to, and the court ultimately instructed the jury to the same effect. Even if the inferences drawn by the prosecutor may have confused the issues or invited speculation about facts not in evidence, her immediate clarification and the court's curative instruction ensured defendant was not prejudiced.

## B. INSTRUCTIONAL ERROR

Defendant takes issue with the trial court's use of CALCRIM No. 1193, the standard jury instruction on CSAAS, for two reasons. He contends the instruction improperly allowed jurors to use CSAAS testimony both as evidence of defendant's guilt, and as evidence that the alleged victims' behavior "was consistent with" (as opposed to "not inconsistent with") the behavior of sexual abuse victims. We review claims of instructional error de novo. If a challenged instruction is ambiguous, we independently review whether the jury is reasonably likely to have construed or applied the instruction in a manner contrary to law. (*People v. Berryman* (1993) 6 Cal.4th 1048, 1077.) In reviewing whether the trial court properly instructed the jury, we consider " 'the entire charge of the court' " rather than focusing on any single instruction. (*People v. Carrington* (2009) 47 Cal.4th 145, 192.)

As defendant acknowledges, his first challenge to CALCRIM No. 1193 has been considered and rejected by numerous appellate courts. (See *People v. Ortiz* (2023) 96 Cal.App.5th 768, 816 (*Ortiz*); *People v. Lapenias* (2021) 67 Cal.App.5th 162, 175–176; *People v. Munch* (2020) 52 Cal.App.5th 464, 473–474; *People v. Gonzales* (2017)

10

16 Cal.App.5th 494, 503–504.) Here, as in *Gonzales*, a CSAAS expert "testified that CSAAS is not a tool to help diagnose whether a child has actually been abused" but rather a tool "to understand a child's reactions when they have been abused." (*Id.* at pp. 503–504.) A juror who believed the expert's testimony would find both that a victim's "apparently self-impeaching behavior does not affect her believability one way or the other, and that the CSAAS evidence does not show she had been molested." (*Id.* at p. 504.) We follow *Gonzales* in concluding the trial court's use of CALCRIM No. 1193 in this trial did not improperly allow the jury to use the CSAAS testimony as evidence of defendant's guilt.

Defendant's second objection to CALCRIM No. 1193 concerns the words "consistent with" rather than "not inconsistent with" in its final sentence: "You may consider this evidence only in deciding whether or not an alleged victim's conduct was consistent with the conduct of someone who has been molested, and in evaluating the believability of her testimony." The double negative "not inconsistent with" appeared in a previous version of CALCRIM No. 1193 and was only recently replaced, which explains why—as defendant emphasizes—nearly all published opinions discussing the instruction refer to the previous language. (See, e.g., *Ortiz*, *supra*, 96 Cal.App.5th at p. 815.) We are satisfied that the two phrases are semantically equivalent, reflecting the elimination of a double negative in favor of a plain English construction to enhance juror comprehension. (See Cal. Rules of Court, rule 2.1050 [Judicial Council goal is to provide "standardized instructions that accurately state the law in a way that is understandable to the average juror"].)

As we have noted, a challenged jury instruction " ' "may not be judged in artificial isolation," but must be considered in the context of the instructions as a whole *and the trial record*.' " (*People v. Foster* (2010) 50 Cal.4th 1301, 1335.) The CSAAS expert testified that CSAAS is not a diagnostic tool. CALCRIM No. 1193 also informed the jury that CSAAS evidence was "offered only to explain certain behavior of an alleged

victim of child sexual abuse" and "is not evidence that the defendant committed any of the crimes charged against him or any conduct or crimes with which he was not charged." The final sentence of the instruction, which stated that the jury could use CSAAS evidence to determine whether the alleged victims' behavior was consistent *or inconsistent* with that of child sexual abuse victims, "did not compel a conclusion that the victims' conduct was consistent with being a sexual abuse victim." (*Ortiz*, *supra*, 96 Cal.App.5th at p. 816 .) We conclude the court's use of CALCRIM No. 1193 was proper in this context and defendant's constitutional rights were not violated. (See *ibid.*)

As we have found neither prosecutorial misconduct nor instructional error, we reject defendant's claim of cumulative prejudice from the deficiencies he has asserted.

## III.    DISPOSITION

The judgment is affirmed.

_____
Grover, Acting P. J.

**WE CONCUR:**

_____
Lie, J.

_____
Bromberg, J.

H050961
*People v. Betancourt*